259 N.J. Super. 499 (1992)
614 A.2d 622
GUY BUSSELL, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
DEWALT PRODUCTS CORPORATION AND JOHN DOE, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 21, 1992.
Decided October 9, 1992.
*503 Before Judges SHEBELL, A.M. STEIN and CONLEY.
Clarkson S. Fisher, Jr. argued the cause for appellant and cross-respondent Black & Decker (U.S.) Inc. (Ober, Kaler, Grimes & Shriver, attorneys; Clarkson S. Fisher, Jr. of counsel and on the briefs; John P. Flanagan, on the brief).
Arthur Penn argued the cause for respondent and cross-appellant (Pellettieri, Rabstein and Altman, attorneys; Arthur Penn, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Plaintiff, Guy Bussell, suffered the amputation of his thumb and three fingers on June 27, 1980 when he was operating a radial arm saw at his place of employment in Princeton, New Jersey. A detailed procedural history of this case is required for an understanding of the issues raised concerning appellant-Black and Decker's liability as a successor manufacturer.
On July 8, 1981, plaintiff filed a complaint in the Law Division and named DeWalt Products Corporation (DPC), the manufacturer, and John Doe, the party responsible for repair and maintenance of the saw, as defendants. A jury rendered a verdict against DPC in the amount of $600,000 on the basis that the saw was not reasonably safe for its intended purposes. Judgment was entered against DPC in the sum of $792,000 on March 23, 1984, reflecting the amount of the jury verdict and $192,000 in prejudgment interest.
On May 24, 1984, plaintiff filed a notice of motion to compel posting of a bond. DPC informed the court that it would not seek a stay of execution and that plaintiff could attempt to execute on any of DPC's assets that it could locate in New Jersey in accordance with court rules.
DPC appealed the judgment to this court. We reversed the lower court's judgment on the grounds that the judge failed to charge the jury that the damage award was not subject to *504 federal or state income tax. Bussell v. DeWalt Products Corp., 204 N.J. Super. 288, 498 A.2d 787 (App.Div. 1985). The Supreme Court granted certification and reversed, reinstating the judgment of the trial court. Bussell v. DeWalt Products Corp., 105 N.J. 223, 519 A.2d 1379 (1987).
On February 24, 1987, plaintiff moved for an order seeking judgment against Black & Decker (U.S.) Inc. (Black & Decker) as DPC's successor in interest, or, in the alternative, against Home Insurance Company, Black & Decker's insurance carrier. On March 9, 1987, plaintiff's motion to amend the judgment was removed by Black & Decker to the United States District Court. Plaintiff moved to remand to our state courts, and the federal district court granted plaintiff's motion on April 6, 1987. Black & Decker appealed to the Court of Appeals for the Third Circuit; however, on April 30, 1987, the Court of Appeals dismissed the proceedings on the grounds that it lacked jurisdiction. The federal district court remanded the matter back to our Law Division on May 5, 1987.
On June 23, 1987, the Law Division held that "there was only one party defending this action, and that was Black & Decker through its carrier, Home Insurance," and entered judgment against Black & Decker. However, plaintiff's motion to join Home Insurance Company was denied. Black & Decker appealed the granting of plaintiff's motion to amend the judgment. On August 15, 1988, we ruled that the judge's determination that Black & Decker had the opportunity to be heard and participated in the suit from the outset was correct. However, we found that Black & Decker's liability under the theory of successor liability pursuant to Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 431 A.2d 811 (1981), "was never presented before the trial court." Because of this, we remanded the matter "for a plenary hearing to determine Black & Decker's liability under Ramirez." Black & Decker petitioned the Supreme Court for certification, and plaintiff filed a cross-petition. Both petitions were denied.
*505 On remand, Black & Decker filed a motion in the Law Division seeking an order dismissing all proceedings against it. This motion was denied on March 3, 1989. Black & Decker then filed a motion for disqualification, requesting an order that the motion judge be disqualified from all further proceedings on the basis of statements made by the judge during the March 3, 1989 hearing. On July 22, 1989, the judge vacated all orders he had previously entered after our August 15, 1988 remand.
On August 15, 1989, Black & Decker refiled its motion seeking an order dismissing all proceedings. The Assignment Judge of Mercer County, who had assumed handling of the case, concluded that Black & Decker had participated in the proceedings and waived any due process issues that may have been present. By order dated December 18, 1989, he denied Black & Decker's motion to dismiss and ordered that discovery on the issue of successor liability be completed within 150 days.
On February 16, 1990, Black & Decker moved for summary judgment. The judge noted that the only issue to be determined was successor liability under Ramirez. The court denied summary judgment and rejected Black & Decker's request for a jury trial and the argument that Maryland law should govern.
In the interim, plaintiff had filed an action against Home Insurance Company on the grounds of misrepresentation. Home Insurance Company settled this claim for $150,000 on April 7, 1992.
On January 3, 1992, the Assignment Judge filed his written opinion holding that Black & Decker was liable to plaintiff for the judgment. On February 3, 1992, judgment was entered in favor of plaintiff in the amount of $1,241,317.81, reflecting the $600,000 jury award of March 21, 1984 and prejudgment interest in the amount of $641,317.81.
Black & Decker appeals, and plaintiff cross-appeals asserting that the award of prejudgment interest should have run only until the date of the original judgment on March 21, 1984 and that interest thereafter constituted post-judgment interest.
*506 On September 25, 1991, the parties entered a stipulation of facts in connection with the Ramirez hearing that had forty-two joint exhibits attached. These facts primarily focus on the corporate transactions from the time DPC manufactured the saw through Black & Decker's acquisition of the assets of DPC.
The stipulations establish that DPC was incorporated in Pennsylvania in 1928 and its manufacturing enterprise was located in Lancaster, Pennsylvania. DPC manufactured only radial arm saws, and the radial arm saw that injured plaintiff was manufactured by DPC in 1941. On January 28, 1947, DPC changed its name to DeWalt, Inc. and continued to manufacture radial arm saws at the Lancaster plant. On September 26, 1949, DeWalt, Inc. entered into an agreement with American Machine and Foundry Company (AMF) for the sale of all DeWalt, Inc.'s assets in exchange for cash and shares of common stock of AMF. Under the terms of this agreement, AMF expressly assumed liabilities and all obligations of DeWalt, Inc. as of June 30, 1949.
On October 28, 1949, DeWalt, Inc. changed its name to D-W, Inc., and on that same date AMF formed a new corporation, DeWalt, Inc., in Pennsylvania. A few days later on November 1, 1949, the original DeWalt, Inc. assigned all of its assets to AMF. AMF then transferred all of the assets it had obtained from the original DeWalt, Inc. to the newly created DeWalt, Inc. in exchange for all of the outstanding stock of the newly formed DeWalt, Inc. In September 1952 D-W, Inc. was dissolved. The AMF-owned DeWalt, Inc. continued to manufacture only radial arm saws. All the saws it manufactured had the name DeWalt on them. On September 4, 1958, AMF, still the sole stockholder of DeWalt, Inc., liquidated and dissolved DeWalt, Inc., after the assignment of all the properties and assets of DeWalt, Inc. to AMF. After acquiring the properties and assets of DeWalt, Inc., AMF continued to manufacture radial arm saws through an unincorporated entity known as the DeWalt Division of AMF at the same Lancaster premises that DPC had occupied in 1928. The only products manufactured by *507 the DeWalt Division of AMF were radial arm saws that bore the trade name DeWalt.
In the late 1950s, Black & Decker discussed the possibility of expanding its product line into the radial arm saw business, and even though it had developed its own radial arm saw, it did not market it as the DeWalt Division of AMF appeared to be obtainable. Black & Decker concluded that it was better to purchase a company with a well-established name and product such as DeWalt. Another consideration was that Black & Decker would be able to use the patents that had originally been obtained by DPC.
On April 14, 1960, AMF formed a new DeWalt, Inc. in Delaware. On April 18, 1960, it was agreed that DeWalt, Inc. would issue 1,000 shares of DeWalt, Inc. common stock to AMF in exchange for all of the properties and assets of the DeWalt Division of AMF. On May 9, 1960, AMF and Black & Decker entered into an agreement and a plan of reorganization. Under this plan, AMF agreed to convey all of the DeWalt, Inc. stock to Black & Decker in exchange for 120,000 shares of the common stock of Black & Decker.
After Black & Decker purchased the stock of the third generation DeWalt, Inc. in 1960, the manufacture of products bearing the name DeWalt continued at the same premises in Lancaster; however, the line of products bearing the name DeWalt expanded to include other products in addition to radial arm saws.
In September 1964, Black & Decker decided to dissolve DeWalt, Inc. Pursuant to the plan of liquidation and dissolution, on September 26, 1964, Black & Decker received from DeWalt, Inc. all of its properties, assets, and good will. After DeWalt, Inc. was dissolved, Black & Decker continued to manufacture radial arm saws bearing the name DeWalt at the Lancaster premises.
When Black & Decker purchased the stock of DeWalt, Inc., it replaced the top management of DeWalt, Inc. with new personnel. *508 The sales representatives of the DeWalt Division of AMF who continued to work for DeWalt, Inc. were no longer independent, exclusive contractors and became employees of Black & Decker. In 1984 Black & Decker sold some of the manufacturing line of DeWalt saws to Lancaster Machinery Company. However, Black & Decker continued to manufacture the ten- and twelve-inch radial arm saws bearing the name DeWalt, and it continues to produce radial arm saws bearing the name DeWalt today.
Pursuant to the transfer of assignment from DeWalt, Inc. in 1964, Black & Decker acquired all the properties, assets, business and good will of DeWalt; the know-how, trade secrets, inventions, patents, patent applications, trademarks, copyrights, and trade names of DeWalt, Inc.; plants, buildings, machinery, equipment, work in process, materials, and supplies; contracts and license agreements of all kinds, cash on hand, and all books and records covering the operations of the business of DeWalt. Further, by Instrument of Assumption dated September 26, 1964, Black & Decker agreed "to be liable for all obligations, debts and liabilities, both direct and contingent, of DeWalt of whatsoever nature and kind."
It is significant that after plaintiff filed his complaint against DPC, the sheriff on July 23, 1981 served Black & Decker's Division Controller of DPC, at its manufacturing plant in Lancaster, Pennsylvania. An answer was filed in the name of DPC by a New Jersey law firm hired by Home Insurance Company, the insurance carrier of Black & Decker.

I.
Black & Decker alleges a denial of due process asserting that plaintiff failed to file any pleading asserting a claim against it. Plaintiff counters that Black & Decker participated in the suit from the outset and that prior decisions by the Superior Court, Law Division and this court preclude Black & *509 Decker from raising the issue in this appeal because of the law-of-the-case doctrine.
When the complaint was filed, plaintiff sued DPC as manufacturer of the saw. The law firm that filed an answer in the name of DPC was hired by Home Insurance Company, Black & Decker's carrier. Interrogatories and supplemental interrogatories propounded by plaintiff upon DPC were answered by Black & Decker's claims administrator. Letters from defense counsel also indicated that Black & Decker was controlling the discovery requests made by plaintiff. Plaintiff's request for information on insurance coverage was answered by defense counsel in two letters indicating that Home Insurance Company, Black & Decker's carrier, had a $2,000,000 policy available to cover the claim. In addition, a handwritten memorandum from defense counsel referred to the action as "Bussell v. DeWalt-Black & Decker."
We recognize that R. 4:2-2 provides that "a civil action is commenced by filing a complaint with the court," and that, pursuant to R. 4:5-2, a pleading which sets forth a claim for relief must contain a statement of the facts on which the claim is based. However, "[t]he critical components of due process are adequate notice, opportunity for a fair hearing and availability of appropriate review." Schneider v. City of East Orange, 196 N.J. Super. 587, 595, 483 A.2d 839 (App.Div. 1984) (citing In re Suspension of Heller, 73 N.J. 292, 310, 374 A.2d 1191 (1977)), aff'd, 103 N.J. 115, 510 A.2d 1118, cert. denied, 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986). Due process is a concept that is flexible, and procedural protections will often depend on the particular circumstances of a case. New Jersey Parole Bd. v. Byrne, 93 N.J. 192, 209, 460 A.2d 103 (1983).
In this case, Black & Decker had notice of the suit from the time service was accepted by the controller of the DeWalt Division of Black & Decker. Defense counsel was hired by Black & Decker's insurance carrier, and the same counsel has continued to represent Black & Decker since the filing of the *510 complaint. Black & Decker fully asserted all defenses throughout the litigation. Although Black & Decker admitted in the Law Division that it participated in the defense of the claim, its alleged reason for the defense was because of its "potential exposure."
We are satisfied that Black & Decker was well aware that it actually was the real party in interest from the outset of the litigation. Although Black & Decker was not formally named in the complaint, it indicated to plaintiff that it was conducting the discovery and that its insurance carrier, Home Insurance Company, had a $2,000,000 policy limit covering plaintiff's claim. It was known to Black & Decker throughout the litigation that DPC was non-existent at the time suit was filed. Black & Decker and its insurance carrier, nonetheless, were able to answer the complaint, respond to discovery requests, and defend at trial. Our assessment of the underlying facts convinces us that Black & Decker's due process rights were not violated; it clearly had notice and an opportunity to be heard. Schneider, supra, 196 N.J. Super. at 595, 483 A.2d 839.
Our 1988 decision clearly held that Black & Decker was effectively represented throughout the litigation. We find nothing to detract from that determination despite appellant's errant but forceful reassertion of the issue. State v. Hale, 127 N.J. Super. 407, 410, 317 A.2d 731 (App.Div. 1974) (once an issue is litigated, relitigation of the same issue should be avoided).
Although our prior decision did not explicitly rule on the issues of jurisdiction and statute of limitations, the determination that Black & Decker had notice and opportunity to be heard and that it was fully represented throughout the litigation eliminated these issues as viable contentions. See Sisler v. Gannett Co., Inc., 222 N.J. Super. 153, 167, 536 A.2d 299 (App.Div. 1987), certif. denied, 110 N.J. 304, 540 A.2d 1283 (1988).
Even if an individual is not named as a party of record, he may be liable for the judgment if he participated in the suit *511 or had an opportunity to be heard. Louisville & Nashville Railroad Co. v. Schmidt, 177 U.S. 230, 20 S.Ct. 620, 44 L.Ed. 747 (1900); see Capo v. C-O Two Fire Equipment Co., 93 F. Supp. 4 (D.N.J. 1950); Miller v. Headley, 109 N.J. Eq. 436, 445, 158 A. 118 (Ch. 1932), aff'd, 112 N.J. Eq. 89 (E. & A. 1933); Lyon v. Stanford, 42 N.J. Eq. 411, 414-15, 7 A. 869 (E. & A. 1886). Clearly Black & Decker had notice of the suit and assumed the role of the real party in interest within the two-year statute of limitations for personal injury actions. N.J.S.A. 2A:14-2; Burd v. New Jersey Telephone Co., 76 N.J. 284, 386 A.2d 1310 (1978). This is the only statute of repose applicable on these facts. Ramirez, supra, 86 N.J. at 356, 431 A.2d 811. The Law Division correctly understood our remand of the matter for a plenary hearing to be limited to a determination of Black & Decker's successor liability for the product manufactured by DPC. It was our conclusion in the prior appeal that all the defenses of Black & Decker were fully considered after it had had full opportunity to be heard, and that the judgment would be binding against Black & Decker if the theory of successor liability under Ramirez were established.

II.
Black & Decker asserts that it was unconstitutionally denied its right to a jury trial. Because a claim based on Ramirez is a claim for monetary damages based on personal injury, Black & Decker contends it had a right to a jury trial because the nature of the action and relief sought are historically legal and not equitable in nature.
The underlying products liability claim was determined by a jury in 1984. Thereafter, the parties entered into a stipulation of facts and joint exhibits. See Ambassador Ins. Co. v. Montes, 76 N.J. 477, 481-82, 388 A.2d 603 (1978). The stipulations and joint exhibits established all of the necessary facts and details regarding the corporate transactions that occurred between the time DeWalt manufactured the radial arm saw in *512 1941 through Black & Decker's acquisition of the third DeWalt, Inc.'s assets in 1964. Only legal issues remained.
The provision of the New Jersey Constitution providing the right to trial by jury "guarantees the right only to the extent that it existed at common law" when the constitution was adopted. Weinisch v. Sawyer, 123 N.J. 333, 342-43, 587 A.2d 615 (1991). If an issue was not triable without a jury prior to the adoption of the 1947 Constitution, it was not triable after this date. In re LiVolsi, 85 N.J. 576, 587, 428 A.2d 1268 (1981). However, we need not decide in these circumstances whether the Supreme Court's decision in Ramirez in 1981 created a new cause of action not available to plaintiffs at common law as of 1947. The stipulations eliminated the requirement of a jury trial as no contested factual issues remained.

III.
Black & Decker asserts that because its domicile was in Maryland, Maryland law should govern because of that State's interest in assuring that its domiciliaries conform to Maryland's standards of care. Also because the contract for its purchase of the stock of DeWalt, Inc. was finalized in Maryland in 1960, Black & Decker argues that the parties expected Maryland law to govern the transaction.
In resolving an issue of choice of law, New Jersey applies the governmental interest test. State v. Curry, 109 N.J. 1, 7, 532 A.2d 721 (1987). Under a governmental interest analysis, two steps are necessary. The first step is determining whether there is actually a conflict between the laws of the interested states. Veazey v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986). Here, the laws of Maryland and New Jersey do conflict. New Jersey has adopted the product-line theory of successor liability, which would potentially subject Black & Decker to liability. Maryland, on the other hand, has recently rejected the product-line theory. Nissen Corp. v. Miller, 323 Md. 613, 594 A.2d 564, 573 (1991). Maryland adheres to the *513 general rule that successor corporations are not liable in products liability cases for defects in products manufactured by predecessors. Ibid.
The second step is to decide which state has the most significant interest in the litigation. Veazey, supra, 103 N.J. at 248, 510 A.2d 1187. Plaintiff is a New Jersey resident who was employed in New Jersey when the injury occurred. He filed a workers' compensation claim in New Jersey. The plant where the radial saw was manufactured was located in Lancaster, Pennsylvania; however, the machine was delivered and used in New Jersey. The underlying New Jersey interest in protecting its residents and workers from product defects and fully compensating individuals injured by defective products must be considered paramount to Maryland's in a tort defendant's corporate affairs. See Deemer v. Silk City Textile Machinery Co., 193 N.J. Super. 643, 475 A.2d 648 (App.Div. 1984) (products liability action where plaintiff was North Carolina resident but product was designed and manufactured in New Jersey). Maryland is not the state where the radial arm saw was designed or manufactured. In light of New Jersey's policy of imposing costs of injuries from defective products on the manufacturer instead of the innocent third party, Ramirez, supra, 86 N.J. at 354, 431 A.2d 811, the law of New Jersey must govern this action.

IV.
Black & Decker maintains that the trial judge erred as he did not hold plaintiff to the burdens of producing evidence and of persuasion. It notes that "the parties did not stipulate any of the ultimate facts in this case."
Black & Decker, in its brief on appeal to this court, sets forth under the procedural history:
On September 25, 1991, Bussell and Black & Decker submitted a pleading entitled "Stipulation of Facts" together with 42 exhibits which, in light of the *514 trial court's earlier rulings, made up all the facts which either party believed relevant on the Ramirez issues. [Appendix references omitted].
We, therefore, fail to see how any issue as to the burden of proof regarding Black & Decker's liability under Ramirez existed. As we have previously stated, the only question that remained was one of law.

V.
Black & Decker argues that even if all of its other arguments are to no avail, it nonetheless should not be held liable on a theory of successor corporate liability. It argues that Ramirez is no longer good law, but even if this court is bound by Ramirez, Black & Decker contends it is not liable under the Ramirez analysis.
Ramirez, decided in 1981, is the seminal products liability case in which our Supreme Court rejected traditional notions of successor liability and adopted the product-line theory of liability. In holding the successor corporation liable for the injuries caused by a power press manufactured by a predecessor company, our Supreme Court substantially adopted the product-line theory of liability set forth in Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977). The Court observed that "the Ray test is concerned not with the continuation of the corporate entity as such but rather with the successor's undertaking to manufacture essentially the same line of products as the predecessor." Ramirez, supra, 86 N.J. at 347, 431 A.2d 811. This is evidenced by reference to the following passage in Ray:
We * * * conclude that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired. [86 N.J. at 349, 431 A.2d 811 (quoting Ray, supra, 136 Cal. Rptr. at 582, 560 P.2d at 11)].
The Ramirez Court also referred to the threefold justification offered by Ray as supporting the imposition of liability on a successor corporation.

*515 (1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business. [Ibid. (quoting Ray, supra at 580, 560 P.2d at 9)].
The Court referred to these three factors as policy considerations justifying "the imposition of potential strict tort liability" on a successor corporation. Ibid.
Our Supreme Court made it clear that much of its decision to adopt the product-line theory was related to the policy of imposing costs of defective products on manufacturers and consumers rather than on the injured person. Id., at 354, 431 A.2d 811. The Court concluded:

[W]e hold that where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor. The social policies underlying strict products liability in New Jersey are best served by extending strict liability to a successor corporation that acquires the business assets and continues to manufacture essentially the same line of products as its predecessor, particularly where the successor corporation benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers. [Id. at 358, 431 A.2d 811 (emphasis added)].
Likewise, in the companion case of Nieves v. Bruno Sherman Corporation, 86 N.J. 361, 431 A.2d 826 (1981), our Supreme Court stated:
The imposition on [the successor corporation] of potential liability for injuries caused by defects in the [purchased] product line is justified as a fair and equitable burden necessarily attached to the substantial benefit that it enjoyed in the "deliberate albeit legitimate exploitation of [the predecessor's] established reputation as a going concern manufacturing a specific product line." [Id. at 369, 431 A.2d 826 (quoting Ray, supra, 136 Cal. Rptr. at 581, 560 P.2d at 10)].
The Court found that the successor corporation in Nieves was in the better position to provide for the costs caused by defective products because it had acquired all the assets and sources *516 of information related to the predecessor product line. Id., at 369, 431 A.2d 826.
In Nieves, an intermediate successor corporation argued that successor liability should only apply to existing corporations that are manufacturing the product line at the time of plaintiff's injury. The Court, however, explained:
The fact that there are two such successors ... in the present case does not alter the reality that [the intermediate successor's] acquisition of the business assets and manufacturing operation ... contributed to the destruction of the plaintiff's remedies against the original manufacturer. By acquiring the business assets of ... and continuing the established operation of manufacturing and selling .. . die-cutting products, [the intermediate successor] "became `an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products.'" [Id. at 371, 431 A.2d 826 (quoting Ray, supra, 136 Cal. Rptr. at 582, 560 P.2d at 11)].
Black & Decker points out that only three states have adopted the Ray approach, whereas numerous courts have rejected it. Black & Decker asserts that "Ramirez is bankrupt" and the "product line exception, upon application and experience, has proven illusory." Whether we were to agree or not with appellant's assertion, we are bound by the holdings in Ramirez and Nieves. Liptak v. Frank, 206 N.J. Super. 336, 338-39, 502 A.2d 1147 (App.Div. 1985), certif. denied, 103 N.J. 471, 511 A.2d 652 (1986); see also State v. Culley, 250 N.J. Super. 558, 564, 595 A.2d 1098 (App.Div.), certif. denied, 126 N.J. 387, 599 A.2d 164 (1991). In addition, we specifically reject Black & Decker's argument that the adoption of the New Jersey Products Liability Act (N.J.S.A. 2A:58C-1 to -7) indicates a legislative intent to overrule Ramirez and Nieves.
Black & Decker next maintains that if this court is bound by Ramirez, it is not liable under Ramirez for many reasons. The first position Black & Decker takes is that it did not acquire all or substantially all of DPC's manufacturing assets. Because the trial court held that the manufacturing assets that Black & Decker acquired in 1960 were not substantially the same as those received by AMF in 1949, Black & Decker argues that this compels a judgment in its favor.
*517 The trial judge found that it was not necessary that all of the exact assets transferred by DPC to AMF in 1949 had to be involved in the transfer to Black & Decker in 1960. He noted that if it were required, "successor liability upon any corporation other than the immediate purchaser from the manufacturer would seldom exist." He held:
It is, however, without dispute that all of the remaining original assets transferred by DeWalt Products Corporation were transferred to Black & Decker as well as all remaining assets which were acquired by defendant's successors (Black & Decker's predecessors) during the intervening period in which the sole business of the successors was the manufacture of radial arm saws. No more is required.
We find no error. In Nieves, two corporate transactions were involved. The original manufacturer sold its enterprise to a second corporation in 1964. A new subsidiary was formed to continue the manufacture of the product line. In 1972, eight years later, the new owner sold those assets involved with the manufacture of the product to another company. Those assets included the good will, tradename, patents, trademarks and equipment used in the manufacturing process. Nieves, supra, 86 N.J. at 365-66, 368, 431 A.2d 826. The Court on those facts held that through this transaction, the ultimate corporate purchaser acquired all of the assets and information relating to the original manufacturer's product line. Id. at 369, 431 A.2d 826.
Although Black & Decker did not receive all of the exact assets that were transferred by DPC to AMF in 1949, Black & Decker did receive all the assets and information that related to the manufacture of DeWalt radial arm saws. Black & Decker received the good will, trademarks, inventory, equipment, and the same manufacturing plant that AMF had acquired from DPC. This was sufficient to support the finding that Black & Decker received all or substantially all of the assets of DPC, even though AMF was an intermediate successor.
"Public policy requires that having received the substantial benefits of the continuing manufacturing enterprise, the successor corporation should also be made to bear the burden of the operating costs that other established business operations *518 must ordinarily bear." Ramirez, supra, 86 N.J. at 352-53, 431 A.2d 811. It is not disputed that Black & Decker chose to acquire the Dewalt Division of AMF because it "was much better to buy a company that was established with a wellknown product in the market." Black & Decker considered it important that it would be able to use the DeWalt name and its patents. Because Black & Decker consciously chose to purchase a manufacturing enterprise that was well established and benefited from the purchase, it cannot avoid successor liability just because the assets of 1949 were not exactly the same as those acquired in 1960.
Black & Decker also places significance on the fact that there were several agreements during the corporate transactions regarding assumption of liabilities. In Ramirez, there was an express contractual provision providing that the successor corporation would not assume liability for products liability claims. Ramirez, supra, 86 N.J. at 339, 431 A.2d 811. The Court in Ramirez ignored the express contractual disclaimer in finding that a successor corporation could be held strictly liable for injuries caused by defects in "units of the same product line." Id. at 358, 431 A.2d 811. We conclude for the same policy reasons that even where the agreements show an assumption of liability by an intermediate purchaser this does not cause a break in the chain of liability of subsequent successor corporations. See Nieves, supra, 86 N.J. at 369, 431 A.2d 826.
Black & Decker's further contention that it did not undertake essentially the same manufacturing operation as the selling corporation is also without merit. The trial judge acknowledged that the changes were made as a result of technology, but he properly concluded that this was not dispositive of the Ramirez requirement of undertaking essentially the same line of manufacturing. Ramirez, supra, 86 N.J. at 358, 431 A.2d 811. As the judge noted, the word "essentially" does not mean "identically."
*519 The Ramirez Court held that what is "most important" is the "continuity in the manufacturing of the [original manufacturer's] product line throughout the history of these asset acquisitions." Id. at 350, 431 A.2d 811. Thus, although there had been significant changes in the radial arm saws produced over the years, it is clear that there was the requisite continuity in the case now before this court. The parties stipulated that Dewalt's basic patented idea for radial arm saws is still in use today, that a distinguishing feature of the radial arm saw that injured plaintiff is still included in the arm saws produced, and that Black & Decker is still manufacturing radial arm saws that bear the DeWalt name. Further, when AMF acquired the assets of DeWalt, Inc. in 1949, it continued to manufacture radial arm saws at the same manufacturing plant until the acquisition by Black & Decker, after which AMF immediately discontinued the manufacture of the radial arm saws bearing the DeWalt name. Until 1984, the production of DeWalt radial arm saws by Black & Decker took place at the original place of manufacture in Lancaster.
Noting that the first of the three Ray rationales is the "virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business," Ramirez, supra, 86 N.J. at 349, 431 A.2d 811, Black & Decker takes the position that it did not cause the destruction of plaintiff's remedies against DeWalt, but rather that AMF was responsible for this.
We find the recent Law Division opinion in Pacius v. Thermtroll Corp., 259 N.J. Super. 51, 611 A.2d 153 (Law Div. 1992) to be well-reasoned and informative on this particular issue. Judge Menza there concluded:
Although both [Ramirez and Nieves] considered the Ray factors as a basis for the imposition of liability, the Supreme Court did not incorporate them into its holdings, nor indicate that they were necessary elements for the imposition of liability. The emphasis in Ray and Nieves was that the company which manufactured the product was not viable. It was the fact of nonviability of the predecessor company which governed the imposition of liability, not the reason for it. [259 N.J. Super. at 56, 611 A.2d 153].
*520 Black & Decker has referred us to several unreported cases interpreting the "Ray-total-destruction-rationale" as a strict requirement for imposition of successor liability. We reject these holdings. The product-line approach to liability was adopted by the Supreme Court in order to provide plaintiffs a remedy where they otherwise might not have one. Plaintiff in this action is without remedy against DPC. The burden of defective products should not be placed on the injured party, but instead should be borne by the manufacturers who are able to both calculate and adjust the risk. Black & Decker received substantial benefits from the assets it acquired from AMF, namely the patents, good will, and tradename of DeWalt. Imposition of liability on Black & Decker flows from the substantial benefit it derived from the acquisition of assets and the continuation of the product line after the demise of DPC. These benefits only resulted and flowed to Black & Decker as a result of the virtual destruction of DPC.
Black & Decker maintains that AMF was in a better position to assume DPC's risk spreading role. We disagree. AMF ceased manufacturing DeWalt products at the time of Black & Decker's acquisition. Assuming that AMF might be in a position to assume the role of risk-spreader, it is obvious that Black & Decker, since the acquisition of the DeWalt line in 1960, is at least as well-equipped to spread the risk among its consumers.
Lastly, Black & Decker maintains that it is unfair to impose liability on it for the injuries sustained by plaintiff. Black & Decker notes that the theory of proximate causation is a fundamental tort requirement. Because Black & Decker had no causal connection to the manufacture or sale of the defective product, it maintains that liability should not be imposed. Causation, however, has no relationship to the theory of successor corporate liability. Rather, fairness is based on the benefit received by the successor corporation in acquiring the assets and product line of the predecessor. The liability of Black & Decker was properly determined by the Law Division.

*521 VI.
Plaintiff in his cross-appeal takes the position that interest running since the entry of the original judgment on March 23, 1984 should be set at the post-judgment rate. Black & Decker argues that the trial court erred when it awarded plaintiff prejudgment interest from the date plaintiff's complaint was filed on July 8, 1981 because of the exceptional circumstances in the case.
R. 4:42-11 controls both prejudgment and post-judgment interest. The rule provides in pertinent part:
4:42-11. Interest; Rate on Judgments; in Tort Actions
(a) Post Judgment Interest. Except as otherwise ordered by the court or provided by law, judgments, awards and orders for the payment of money, taxed costs and counsel fees shall bear simple interest as follows:
....
(b) Tort Actions. Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, including products liability actions, include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. [R. 4:42-11 (emphasis added)].
Prior to the amendment to the rule in 1975, prejudgment interest was mandatory. The rule was amended, however, and the running of interest may be suspended under exceptional circumstances.
The intent of awarding prejudgment interest is not punitive.
The basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled. [Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 506, 323 A.2d 495 (1974)].
A trial court has the discretion to grant or deny prejudgment interest according to the equities. "In such cases this court will defer `to that action unless it represents a manifest denial of justice.'" Fasolo v. Board of Trustees of *522 Div. of Pensions, 190 N.J. Super. 573, 585, 464 A.2d 1180 (App.Div. 1983) (quoting Elizabeth Police Superior Officers Ass'n v. Elizabeth, 180 N.J. Super. 511, 517, 435 A.2d 1161 (App.Div. 1981)); see also County of Essex v. Waldman, 244 N.J. Super. 647, 667, 583 A.2d 384 (App.Div. 1990) ("We usually will defer to the trial judge's exercise of discretion unless it represents a manifest denial of justice."), certif. denied, 126 N.J. 332, 598 A.2d 890 (1991). We find no abuse of discretion in this case where Black & Decker has been the real party in interest throughout the litigation. The interest requirement will not result in a "manifest denial of justice" to Black & Decker.
In addition, we do not find it unjust to require payment of interest merely because the recusal of the first remand judge was not the fault of Black & Decker or because to the view of Black & Decker, the proceedings were stayed at one point. Defendant was able to use the money during the entire prejudgment period while plaintiff remained substantially uncompensated for his injuries.
We likewise reject plaintiff's position that interest running from the March 21, 1984 verdict should be considered post-judgment interest. Plaintiff could have more diligently obtained a direct judgment against Black & Decker, thereby making it clearer to Black & Decker that its liability for payment of the judgment was absolute and not merely potential.
Affirmed.