OPINION OF THE COURT
Gloria Cohen Aronin, J.
In this negligence action, defendants Chromalloy Pharmaceutical Inc. (CPI), Chromalloy American Corp. (CAC) and Sequa Corporation move for an order of this court pursuant to CPLR 3212 granting summary judgment in their favor dismissing plaintiff’s complaint because CPI, CAC and Sequa had no connection with the manufacture, sale or distribution of thorotrast, the carcinogen which allegedly caused the untimely death of Ari Rothstein; nor are CAC, Sequa and CPI successors of the corporation which did. Further, CPI, CAC and Sequa are separate corporate entities which have complied with the requisite corporate formalities, to wit: maintained separate boards of directors and officers which met regularly to conduct business, separate books and records, separate management, separate employees, separate assets and are adequately capital *439 ized; thus, no basis exists to pierce their respective corporate veils.
Defendant Tennessee Gas Pipeline Company (hereafter TGPC) also moves for summary judgment in its favor dismissing plaintiffs complaint against it, because neither it, nor its wholly owned subsidiary Tenneco Resins, Inc. (hereafter TRI), ever manufactured, sold or distributed thorotrast. Further, defendant TGPC notes, assuming arguendo, that TRI is liable to plaintiff, there is still no basis to impose liability on TGPC because at all times TGPC and TRI have been separate and distinct corporations which observed all required corporate formalities.
Defendant American Cyanamid Company (hereafter AmCy or Cyanamid) moves for summary judgment in its favor dismissing plaintiffs complaint against it because although it purchased the right to manufacture, sell and distribute thorotrast from Heyden Chemicals Corp. (hereafter Heyden), the only United States manufacturer of said product, it never used the rights, and in fact sold said rights one year later to Testagar and Company (hereafter Testagar). Thus, defendant AmCy claims that no basis in law exists to impose liability against it based on decedent’s exposure to thorotrast.
In opposition, plaintiff maintains that all defendants are liable as successors in interest to Heyden, the manufacturer of thorotrast, and/or based on the product line exception theory. Further, plaintiff claims defendants are liable to plaintiff based on their own failure to warn users of the dangers of said product.
In 1932, Heyden applied to the American Medical Association’s Council on Pharmacy and Chemistry for approval of thorotrast, the pharmaceutical brand name for colloidal thorium dioxide, a radioactive contrast dye used in patients to assist in taking x-rays and making diagnoses. The Council refused to approve thorotrast because of its concern over the safety of administering a radioactive substance into the human body, since such substances were not eliminated and were retained in a patient’s liver and spleen. Since the Council’s refusal was nonbinding in effect, Heyden, the sole manufacturer of thorotrast, continued to promote and market thorotrast for human administration in the United States.
Plaintiffs husband was exposed to thorotrast as a child during medical testing in a hospital in Washington, D.C. during 1948 through 1949. As an alleged result of said exposure, Ari Rothstein died in 1988, at age 50, during exploratory surgery, *440 from massive internal bleeding due to an angiosarcoma mass that had developed on his liver.
In 1953, Heyden sold its antibiotic division to AmCy which included Heyden’s trademarks, patents, good will and business (including customer lists) relating to thorotrast (and a related radioactive product known as umbrathor). The antibiotic division constituted 20% of Heyden’s business and thorotrast was a minor part of said antibiotic line. Pursuant to the sales agreement between Heyden and AmCy dated November 3, 1953, Heyden agreed to indemnify and hold AmCy, its successors in interest and its assigns, harmless from any liability arising out of Heyden’s operation of the antibiotic division prior to closing. Further, article IV (A) (1) provides:
"A. In consideration for the transfers and conveyances provided for in subparagraphs (1) to (7) inclusive, of Paragraph A of article III hereof, cyan amid shall:
"(1) duly assume as of the closing provided for herein all obligations of heyden thereafter arising under all licenses, rights, permits, leases, agreements and contracts assigned by heyden to cyan amid pursuant to this Agreement”.
Article V provides: "B. heyden agrees to indemnify, defend and save cyanamid and its subsidiaries and/or their successors and assigns harmless from and against any and all claims of whatsoever nature, including the cost of any litigation thereof, arising out of or in connection with the operation of and conduct by heyden of the business of its Antibiotic Division prior to the closing date hereunder, including, without limitation, claims for infringement of patents, default in performance of contract obligations, nuisance claims and claims or liability arising through violation of any law or governmental regulation.” Following the sale, Heyden remained in business for approximately 10 years, but no longer manufactured or sold thorotrast.
Although AmCy acquired all of Heyden’s right to the thorotrast product line, it ceased production of the product and so notified the Food and Drug Administration and all of the known users of thorotrast. (AmCy did distribute small amounts of thorotrast to physicians and hospitals.) Instead, AmCy decided to sell the thorotrast product line and, in an offering brochure for the sale of thorotrast, noted that the Heyden medical director’s file indicated:
"(1) Evidence is accumulating that the product causes very serious damages years after even a single dose.
*441 "(2) During 1951, at the request of the FDA, The American College of Radiology * * * report * * * said that Thorotrast should be used only in extreme emergency or where life expectancy is short. a
"(3) The FDA advised Heyden in 1953 that Thorotrast labeling should carry such a warning to avoid prosecution”.
Further, the following additional information was contained in the Heyden medical director’s file: "(1) * * * 10/24/53 * * * reports of thorotrast deposits in man mention seven deaths attributable to the radioactivity of thorium * * * The doses of thorotrast commonly used are carcinogenic”.
AmCy sold the thorotrast product line in 1954 to Testagar which had been a distributor of Heyden’s thorotrast. In consideration for this sale, AmCy received a cash payment as well as a 5% royalty on all future thorotrast product line sales. AmCy retained the right to send in an independent public accountant to verify the accuracy of Testagar’s calculation of the 5% royalty, and restricted Testagar’s right to assign the thorotrast product line. In the sales agreement, the parties acknowledged that the thorotrast product line was "highly toxic”.
Pursuant to the AmCy/Testagar agreement, AmCy transferred to Testagar (1) all the equipment and operating instructions of the manufacture and storage of thorotrast; (2) supplies for the packaging and distribution of thorotrast; (3) inventory of the product; (4) historical sales information with respect to the product classified by type of purchaser, costs and sales and profit history; (5) customer lists; (6) good will and trademark rights; (7) information as to the toxicity of the product from the records of Heyden Chemicals Corp.’s medical director; (8) sales and technical files; (9) labels and inserts prepared by Heyden for distribution of thorotrast; and (10) medical literature regarding thorotrast.
Testagar did not acquire the thorotrast manufacturing plant or accounts receivable from Heyden or AmCy; Testagar did not hire any employees, sales agents or management personnel from either Heyden or AmCy. Further, Testagar agreed to hold AmCy harmless for any claims of personal injury or damages "arising out of this agreement, the use, handling or inherent characteristics of the materials sold hereunder”.
The AmCy/Testagar hold harmless agreement provided: "5. It is understood that said products are of a highly toxic nature and you [Testagar] hereby hold us [AmCy] harmless against any claim for personal injuries, damages or destruction of prop *442 erty of yourselves and/or third persons arising out of this agreement, the use, handling or inherent characteristics of the materials sold hereunder.” (This contractual hold harmless provision is analogous to the hold harmless provision in the Heyden / AmCy agreement involving the sale of thorotrast.)
CPI, through various mergers, is a successor corporation of Testagar, which merged into Fellows I (1962), into Fellows II (1971) and into CPI in 1974. CPI was incorporated in 1973 to combine all of the pharmaceutical businesses owned by CAC into one entity; CAC is a diversified corporation, incorporated since 1947, with "core” interests in metal fabrication, transportation, petroleum services and financial services.
After the sale to Testagar, AmCy provided technical support and expertise to Testagar by updating the operating instructions and providing further information regarding the manufacture of thorotrast.
In 1963, Heyden (then known as Heyden Newport Chemical Corp. [hereafter HDN]), while changing its name to Danport Corporation, sold the balance of its chemical and nonpharmaceutical business to a continuing HDN. Pursuant to the terms of an agreement involving Heyden, HDN and TGPC which had been in existence since 1947, in the business of the transmission of natural gas and other related things, Heyden changed its name, made the transfer to HDN above described and TGPC became the parent corporation of HDN, which later changed its name to Tenneco Resins, Inc.
Sections 1.6 and 1.13 of the 1963 Heyden /TGPC /HDN agreement provided that Heyden had no liabilities, absolute or contingent (other than intercompany liabilities) except for those liabilities identified in an annexed schedule which did not list any thorotrast claims. Further, to the extent that the agreement provided for an "assumption” of liabilities, section 5.3 relates only to an assumption of liabilities by HDN, not TGPC. Thus, in 1963, TRI acquired all the assets of Heyden, except the thorotrast product line which had been sold approximately 10 years earlier to AmCy. In 1963, TRI was acquired by TGPC for the purpose of acquiring and continuing the operation of Heyden’s chemical business, and did so, for almost 20 years.
Substantial thorotrast-related litigation (approximately 40 cases against AmCy and similar numbers against TRI and TGPC) covering injections during the period of 1944 through 1957 against the various corporate defendants herein (among others) commenced as early as 1965, and continued through *443 1991. Although the dangers of thorotrast were earlier documented, the first reported lawsuit was commenced in 1965, after Heyden transferred the product line to AmCy, after AmCy transferred the product line to Testagar, after Testagar merged with Fellows I, and three years before Fellows I ceased production of thorotrast in 1968.
Plaintiffs claims against the defendants are based on the premise that said defendants are successors in interest to Hey-den Chemicals Corp., and are therefore liable for the thorotrastrelated liabilities of Heyden. Heyden was the sole manufacturer of thorotrast from the early 1930’s until late 1953, and, thus, was the manufacturer of the thorotrast which was injected into Ari Rothstein in the late 1940’s.
The court will first consider plaintiffs claims with respect to defendant AmCy. Plaintiff claims AmCy is liable for plaintiffs injuries as a corporate successor, as well as a product line successor, to Heyden based on its assumption of Heyden’s obligations and its failure to warn plaintiff (and other users) of the product’s danger, as well as AmCy’s role as a joint venturer with Testagar.
"It is the general rule that a corporation which acquires the assets of another is not liable for the torts of its predecessor * * * There are exceptions * * * A corporation may be held liable for the torts of its predecessor if (1) it expressly or impliedly assumed the predecessor’s tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.” (Schumacher v Richards Shear Co., 59 NY2d 239, 244-245 [1983].) Some courts have recognized another exception to the general rule of no successor liability by adopting the product line exception. New York courts have not yet applied the exception, generally recognized as a minority rule. (Schumacher v Richards Shear Co., supra; Delgado v Matrix-Churchill Co., 205 AD2d 575 [2d Dept 1994].)
To impose liability on a successor corporation for the tort liability of its predecessor under the product line theory, it must be shown that (1) the successor acquired the entire product line; (2) there is a "virtual destruction” of the remedy against the predecessor; (3) the successor must be able to spread the risk; and (4) the successor must benefit from the original manufacturer’s good will. (In re Thorotrast Cases, 26 Phila 479, 1994 Phila Cty Rptr LEXIS 1, 10; Dawejko v Jorgensen Steel Co., 290 Pa Super 15, 18, 434 A2d 106, 107 [1981].) Courts differ *444 on whether the product line exception is applicable where the predecessor goes out of business for unrelated reasons many years later. Some courts require causation of the virtual destruction of plaintiff’s remedy, to wit: Dawejko v Jorgensen Steel Co. (supra); Ray v Alad Corp. (19 Cal 3d 22, 560 P2d 3 [1977]); Conway v White Trucks (885 F2d 90, 97 [3d Cir 1989]); LaFountain v Webb Indus. Corp. (951 F2d 544 [3d Cir 1991]); Tracey v Winchester Repeating Arms Co. (745 F Supp 1099, 1108 [ED Pa 1990]); Hill v Trailmobile, Inc. (412 Pa Super 320, 327, 603 A2d 602, 606 [1992]). Other courts do not require this causal connection (see, Ramirez v Amsted Indus., 86 NJ 332, 431 A2d 811 [1981]; Bussell v DeWalt Prods. Corp., 259 NJ Super 499, 614 A2d 622 [1992]; Pacius v Thermtroll Corp., 259 NJ Super 51, 611 A2d 153 [1992]; Olejar v Powermatic Div. of De Vlieg-Bullard, 808 F Supp 439 [ED Pa 1992]).
In adopting the product line exception, the Dawejko court noted "it [is] better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation.” (Supra, 290 Pa Super, at 26, 434 A2d, at 111.) Moreover, the court recognized that applicability of the product line exception must be analyzed in a flexible manner, which should consider the following pertinent factors: "whether the successor corporation advertised itself as an ongoing enterprise * * * or whether it maintained the same product, name, personnel, property, and clients * * * or whether it acquired the predecessor corporation’s name and good will, and required the predecessor to dissolve” (supra, 290 Pa Super, at 26, 434 A2d, at 111).
The basic social policy considerations underpinning the adoption of the product line exception to impose liability on a successor corporation is the "imposition of the costs of injuries from defective products on the manufacturing enterprise and consuming public rather than on the innocent injured party”. (Ramirez v Amsted Indus., 86 NJ 332, 354, 431 A2d 811, 823, supra; Boyd v Tennessee Gas Pipeline Co., Super Ct, Camden County, No. L-10232-90.)
Guided by these principles and for reasons which follow, the motion by AmCy for summary judgment in its favor must be denied based on questions of fact regarding AmCy’s liability stemming from its failure to warn and alternately based on the product line exception.
The four recognized exceptions for the imposition of liability on AmCy as the (successor) corporation which purchased the *445 thorotrast product line, along with the assets of the antibiotic division of Heyden, are not applicable under the circumstances herein. First, with regard to the exception concerning assumption of liability, this court finds that AmCy did not assume, expressly or impliedly, the contingent tort liabilities of Heyden notwithstanding that other courts have held to the contrary. (Bouley v American Cyanamid Co., 1987 WL 18738 [D Mass, Oct. 21, 1987, Zobel, J.]; Gee v Tenneco, Inc., 615 F2d 857.) In fact, the plain language of the sale agreement between Heyden and AmCy is unambiguously clear that Heyden retained such liability. Second, Heyden continued in business, unrelated to thorotrast production, after the sale of 20% of its assets to AmCy. Thus, there is no basis to impose liability on AmCy based on the consolidation/merger (second exception) or "mere continuation” exception permitting successor liability for the torts of its predecessor (third exception). Nor is there evidence in the voluminous record before this court that the transfer from Heyden to AmCy was fraudulent (fourth exception). Thus, AmCy is not liable to plaintiff under the traditional exceptions to successor liability recognized in Schumacher v Richards Shear Co. (supra).
Further, plaintiff’s claim that AmCy was a joint venturer with Testagar (and CPI) must be rejected as there is no evidence that AmCy shared in losses. (DeVito v Pokoik, 150 AD2d 331 [2d Dept 1989]; Ashland Mgt. v Janien, 190 AD2d 591, 593 [1st Dept 1993].)
However, AmCy may be liable to plaintiff herein based on a breach of its duty to warn and/or strictly liable based on the product line exception.
A negligence cause of action for failure to warn may exist on behalf of a plaintiff injured by a product against a corporation which subsequently acquires all or part of the assets of the manufacturer of the product. The duty arises because of the relationship between the corporations, and the knowledge which the acquiring corporation possesses or has reason to possess concerning the risk of personal injury created by the product. (Schumacher v Richards Shear Co., 59 NY2d 239, supra.) "For the most part such a duty has been imposed where the relation is of some actual or potential economic advantage to the defendant, and the expected benefit justifies the requirement of special obligations” (Schumacher v Richards Shear Co., supra, at 247 [citations omitted]).
In determining whether to impose an independent duty to warn on a successor corporation, "courts [have] focused upon the relationship between the defendant 'successor’ corporation *446 and the customers of the predecessor and the actual or potential economic advantage to the defendant successor corporation. Several factors may be considered in determining whether there exists a sufficient link to create a duty to warn, among them * * * 'a purchaser corporation’s knowledge of defects and of the location or owner of that [product]’ ” (Schumacher v Richards Shear Co., supra, at 247 [citations omitted]). Further, passage of time is relevant to the duty issue, but it is not dispositive (Schumacher v Richards Shear Co., supra, at 248).
Guided by these principles, AmCy may be liable to plaintiff based on the breach of its duty to warn. AmCy knew or had reason to know of the danger of thorotrast based on the medical documentation provided by Heyden and the Food and Drug Administration (FDA) warnings regarding the necessity to properly label the product; AmCy had the customer lists of users of the product and notified said customers and the Food and Drug Administration that it ceased production of thorotrast without warning them of the known dangers; AmCy economically benefited from the thorotrast product line by retaining a 5% royalty on all future sales of the product by Testagar and by providing technical assistance to Testagar in its production and sale of the product. Thus, under these circumstances, this court concludes that defendant AmCy had an independent duty to warn users of the thorotrast product, a breach of which exposes AmCy to tort liability for the decedent’s alleged injuries and ultimate death. Indeed, the failure to warn is significant in this case, where Dr. Martin Bur, M.D., has opined that knowledge of the dangers could have delayed and/or prevented plaintiff’s premature death.
Furthermore, AmCy may be liable to the plaintiff based on the product line theory. No New York court has yet recognized a case which justifies the adoption of this minority rule of successor liability. However, this court finds that the time has come to accept said exception which appears particularly appropriate to AmCy. Specifically, AmCy acquired the entire thorotrast product line. Heyden, the original manufacturer of thorotrast, no longer exists and is therefore unavailable to remedy decedent’s damages. Moreover, AmCy had knowledge of the dangers of thorotrast and had the opportunity to account for the risks of thorotrast-related claims. Finally, AmCy through its efforts in assisting Testagar in the continuity of the product line benefited from Heyden’s good will and received the financial benefits of the thorotrast business. Thus, *447 under the product line theory, AmCy must bear the burden of thorotrast-related liabilities, rather than the injured plaintiff. (Boyd v Tennessee Gas Pipeline Co., supra.)
This court recognizes that other courts have been reluctant to hold defendants liable after so many decades have passed. (In re Thorotrast Cases, Phila Ct of Common Pleas, Trial Div, filed Jan. 13, 1994, No. 1135, affd sub nom. Simmers v American Cyanamid Corp., Pa Super Ct, Dec. 21, 1995, Nos. 00705, 00704, petition for allowance of appeal denied Pa Sup Ct, ED Pa, July 11, 1996; Sherwood v American Cyanamid Corp., ED Pa, filed Mar. 20, 1992, No. 91-5853.) However, New York courts have recognized that the passage of time is not an impediment to imposition of liability under appropriate circumstances. (Schumacher v Richards Shear Co., supra.) Indeed, the New York Court of Appeals has held in this very case that the plaintiff’s cause of action was not time barred by the Statute of Limitations in spite of the occurrence having taken place almost 50 years earlier. (Rothstein v Tennessee Gas Pipeline Co., 87 NY2d 90 [1995].)
Thus, this court concludes that it is appropriate to deny AmCy’s motion for summary judgment because it may be liable to plaintiff on two separate theories, to wit: breach of duty to warn and product line exception.
Plainly, Testagar, the third corporate entity in the thorotrast product line chain, as a distributor of the product and as manufacturer of the product from June 1954 when it acquired all the rights to thorotrast, and benefited from the good will of Heyden, would be liable to plaintiff based on product line theory and an independent duty to warn if it were still a viable corporate entity. However, Testagar no longer exists as a result of its merger into Fellows I on December 19, 1962. In 1968, Fellows I ceased production of thorotrast and three years later merged into Fellows II (formerly known as FMM) on February 3, 1971. FMM, renamed Fellows II, was a wholly owned subsidiary of CAC. Thereafter in 1973, CPI, another wholly owned subsidiary of CAC, was incorporated to combine all of the pharmaceutical businesses owned by CAC into one entity. In 1974, Fellows II, along with five other corporations owned by CAC, merged into CPI. In the late 1970’s, CAC decided to liquidate its interest in CPI, to commit its capital to its core business. During the period of 1979 through 1981, CPI sold the assets of its operating units to third parties with the assistance of Salomon Brothers. Since 1981, CPI is an inactive corporation. The chief financial officers of CAC firmly state that CAC’s *448 decision to liquidate CPI was not related to thorotrast liabilities and there is no evidence to the contrary. Defendant Sequa, which merged with CAC on December 23, 1986, under another name, is the corporate grandparent of CPI, and thus had no connection with the manufacture or distribution of thorotrast. Sequa is also a diversified corporation, with interest in aerospace, machinery and metal coatings, transportation, specialty chemicals, personal services and financial services.
While the application of the product line exception to Testagar would have been appropriate, the extension of same to CPI, CAC and Sequa would not. CPI, CAC and Sequa did not acquire the thorotrast product line. Testagar did, as did Fellows I until 1968 when its manufacture of the thorotrast product ceased. Thus, plaintiffs attempt to impose Heyden’s thorotrast liability through AmCy through Testagar through Fellows I through Fellows II to CPI to CAC to Sequa is too attenuated. Likewise, no duty to warn can be imposed on CPI, CAC or Sequa since these independent and separate entities had no direct contact with thorotrast or the customers thereof.
Plaintiffs attempt to reach CAC, by piercing the corporate veil of CPI, is unwarranted as a matter of law, based on undisputed facts that CAC did not dominate CPI, or otherwise act as principal, since the pharmaceutical business required FDA approval for the manufacture and distribution of thorotrast and CAC management lacked such expertise. CPI managed its own affairs independently, without CAC’s input. Necessarily, Sequa, as the parent corporation of CAC, likewise bears no responsibility for such thorotrast liability.
Further, the four well-recognized exceptions to the imposition of liability on a successor corporation based on the acts of its predecessor, as set forth in Schumacher v Richards Shear Co. (59 NY2d 239, supra), are inapplicable to CPI, CAC and Se-qua which did not contractually assume the contingent thorotrast tort liability of Heyden. Moreover, the facts plainly established that the transaction between AmCy and Testagar was a sale of only the thorotrast product line, thus, there was no de facto merger, nor was Testagar a "mere continuation” of AmCy. (Wensing v Paris Indus.-N. Y., 158 AD2d 164, 166 [3d Dept 1990]; Goldman v Packaging Indus., 144 AD2d 533 [2d Dept 1988].) Nor is there any evidence of fraudulent avoidance of thorotrast liability in any of the corporate transactions.
With respect to TGPC, it is uncontroverted after the sale of its antibiotic division and thorotrast product line to AmCy in 1954, Heyden continued successfully in the chemical business *449 until 1963, when pursuant to a plan of reorganization dated June 28, 1963, it sold its assets to HDN having bought the name from Heyden and subsequently changed its name (Dan-port Corp.) and then dissolved. TGPC, which was then known as Tennessee Gas Transmission Company, owned all the stock of HDN, which had bought the name from Heyden, and which subsequently changed its name in 1965 to Tenneco Resins, Inc. When HDN (subsequently TRI) acquired Heyden’s assets in 1963 until it ceased doing business in December 1982, Heyden/ TRI was involved in the manufacture and sale of chemicals, not thorotrast. TRI ceased doing business during 1981 through 1982 due to an economic decline in the petroleum and chemical business resulting in $98 million in losses. TRI filed a certificate of dissolution in the State of Delaware on August 26, 1985. TGPC, HDN and TRI never manufactured, sold or distributed thorotrast. TRI was an autonomous entity with $550,000 in sales and close to 1,000 employees. TRI maintained separate offices from TGPC, filed separate tax returns and had separate directors from TGPC (although there was some overlap), and a separate corporate executive body, separate real estate holdings, separate physical plant, warehouses, sales and research facilities.
Based on the aforesaid facts, it is plain that no basis in fact or law exists to impose liability on TGPC, although TGPC and TRI had a parent subsidiary relationship.
Courts will pierce the corporate veil to prevent fraud or other wrongdoing, or where a parent entity dominates and controls a subsidiary (Chase Manhattan Bank v 264 Water St. Assocs., 174 AD2d 504 [1st Dept 1991]). In determining whether a parent entity is an alter ego, New York courts examine the following factors: (1) failure to adhere to corporate formalities; (2) the day-to-day control of the subsidiary by the parent; (3) the subsidiary’s capitalization; (4) a commingling of assets; and/or (5) the use of the subsidiary for fraudulent or unjust purposes. (Walkovszky v Carlton, 18 NY2d 414 [1966]; Forum Ins. Co. v Texarkoma Transp. Co., 229 AD2d 341 [1st Dept 1996]; Austin Powder Co. v McCullough, 216 AD2d 825; Lally v Catskill Airways, 198 AD2d 643 [3d Dept 1993]; Paget v Budget Rent A Car Corp., 160 AD2d 533 [1st Dept 1990]; Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141 [1993].)
It is well settled that "complete domination of the corporation is the key to piercing the corporate veil * * * such domination, standing alone, is not enough; some showing of a wrong *450 ful or unjust act toward plaintiff is required” (Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141-142, supra). In fact, it is well settled that "the imposition of liability upon a parent for the acts of its subsidiary 'can never be predicated solely upon the fact of a parent corporation’s ownership of a controlling interest in the shares of its subsidiary’ ” (Daniels v Zelco, Inc., 159 AD2d 538, 540 [2d Dept 1990] [citations omitted]).
Guided by these principles, it is plain that TGPC’s motion for summary judgment must be granted. The record before this court convincingly establishes that TRI was a separate, autonomous corporation which adhered to all required corporate formalities and managed its daily operations without interference from its parent TGPC. Under these circumstances, there is no basis to pierce the corporate veil of TGPC.
Nor did TGPC assume any of Heyden’s liabilities as a result of the 1963 plan of reorganization. The plain language of the plan does not contain an assumption of liabilities by TGPC and this court must therefore give effect to the intent of the parties. (Kailasanthan v Mysorekar, 234 AD2d 425 [2d Dept 1996]; Simmers v American Cyanamid Corp., Pa Super Ct, No. 00703, Phila, Dec. 21, 1995, affg and adopting In re Thorotrast Cases, 26 Phila 479, 1994 Phila Cty Rptr LEXIS 1 [1994], supra; Boyd v Tennessee Gas Pipeline Co., Super Ct, Camden County, No. L-10232-90, supra.)
AmCy’s motion for summary judgment is denied. The motions for summary judgment by CPI, CAC and Sequa are granted. TGPC’s motion for summary judgment is granted.