198 N.J. Super. 418 (1985)
487 A.2d 742
EARL HENDERSON, PLAINTIFF-APPELLANT,
v.
MORRISTOWN MEMORIAL HOSPITAL, ARTHUR STROCK, SYLVIA DIEHL, M.D., ELIZABETH DEVINEY, SAINT JOSEPH'S CATHOLIC SCHOOL, SISTER MARY RIPP, FATHER JAMES HANLEY AND MARGARET DEGROAT, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1984.
Decided January 29, 1985.
*421 Before Judges MICHELS, PETRELLA and BAIME.
Peter Rosen argued the cause for appellant (Rosen & Garodnick, attorneys; Dennis J. Avigliano, on the brief).
Douglas S. Brierley argued the cause for respondents Morristown Memorial Hospital, Arthur Strock, Sylvia Diehl, M.D. and Elizabeth DeViney (Schenck, Price, Smith & King, attorneys; Clifford W. Starrett and Donald W. Bedell, of counsel; Douglas S. Brierley, on the brief).
Martin Van Der Heide, III, argued the cause for respondents Saint Joseph's Catholic School, Sister Mary Ripp, Father James Hanley and Margaret DeGroat (James P. Evers, attorney; Martin Van Der Heide, III, on the brief).
*422 The opinion of the Court was delivered by MICHELS, P.J.A.D.
Plaintiff Earl Henderson appeals from judgments of involuntary dismissal entered by the Law Division in favor of defendants Morristown Memorial Hospital (Hospital), Arthur Strock, Dr. Sylvia Diehl, and Elizabeth DeViney and Saint Joseph's Catholic School (Saint Joseph's), Father James Hanley, Sister Mary Ripp and Margaret DeGroat after plaintiff's opening to the jury and at the conclusion of the presentation of his proofs.
Plaintiff instituted this action against the Hospital and certain staff members of its Center for Evaluation and Counseling (Center), seeking to recover compensatory and punitive damages based on their alleged negligence and malpractice in the preparation of a child study team report. He also sought damages for the alleged negligent infliction of emotional distress. Plaintiff joined Saint Joseph's and its pastor, principal and one of its teachers as defendants, charging them with intentionally inflicting emotional distress upon him by refusing to discuss his children with him and by failing to follow the recommendations of the Center's child study team. The Hospital and its employees denied that they were under any liability to plaintiff and the Hospital, by way of counterclaim, sought to recover the unpaid balance of the bill rendered for the child study team evaluation and report. Saint Joseph's and its employees also denied that they were under any liability to plaintiff.
The facts essential to an understanding of this matter may be summarized briefly as follows. In August, 1979, after approximately 12 years of marriage, plaintiff and his wife, Elsa Henderson, separated. Three children, a girl and twin boys were born of the marriage. Mrs. Henderson retained custody of the three children with the consent of plaintiff. Sometime in 1979 Mrs. Henderson made application to the public school system for remedial help for the twins, who were attending Saint Joseph's. Plaintiff was concerned about the psychological effect that the divorce was having on his children and the *423 educational assistance his twins were receiving at Saint Joseph's. He was particularly concerned about James, one of the twins, and whether James should be held back in the third grade. He therefore attempted to have Mrs. Henderson agree to a psychological evaluation of the children and sought the assistance of a child evaluation team. When Mrs. Henderson rejected the idea, plaintiff instructed his attorney to pursue the matter. Eventually plaintiff applied for a court order compelling such evaluation in his divorce proceeding pending in the Chancery Division. In March, 1980, the Chancery Division ordered plaintiff, Mrs. Henderson and their children to be evaluated by the hospital's Center. In conformance with the court order the Center conducted the evaluation and in June, 1980 rendered a detailed report, containing the following recommendations:
1. Supervision of visits to the parents by Division of Youth and Family Services.
2. Professional counseling for Mr. Henderson in order to improve the relationship between father and children.
3. Therapy for Maria, John and James and Mrs. Henderson.
4. Academically, it is suggested that the boys not be retained in third grade, but that next year they receive an individualized remediation program in addition to their regular class work. Enrollment in a public school should be considered because of the supplemental programs available in that setting.
5. A summer camp experience for the boys is highly recommended.
According to plaintiff, after he and his wife discussed the Center's report, he called Strock, a clinical social worker with the Center, to obtain a clarification as to why a public school was recommended only for the twins, and not his daughter as well. Strock indicated that the public school recommendation applied to all three children and later confirmed this in writing. Plaintiff thereupon sent a copy of the Center's report to Saint Joseph's and requested that it abide by the recommendations contained in the report. He also directed Saint Joseph's to immediately transfer all records of the children to the public school system. When St. Joseph's did not respond to this letter plaintiff followed with other letters, including a request for the *424 complete report cards of his children for the school year ending June, 1980. In July, 1980 plaintiff telephoned Father Hanley and discussed the mental health of his children and pleaded with the pastor to intercede with his wife to convince her to abide by the Center's recommendations. During this period of time, plaintiff was attempting to get his wife and children to go for counseling and therapy as recommended by the Center. They refused to do so and in August, 1980 plaintiff informed his wife that unless the children were transferred to a public school and she and the children joined him in counseling, he would not pay her the weekly support ordered by the Chancery Division.
Thereafter, plaintiff met with the principal of Saint Joseph's, Sister Ripp, and explained to her how he felt about enforcing the Center's recommendations. According to plaintiff, Sister Ripp indicated that the school was abiding by the wishes of Mrs. Henderson, the custodial parent. Thereupon, in September, 1980, plaintiff obtained an order to show cause in the Chancery Division why the children should not be transferred from Saint Joseph's to the public school system. On the return day of the order, an informal meeting was held in the judge's chambers. Members of the Center's child study team who attended the meeting indicated that the team's preference for a public school expressed in the June 1980 report should be eliminated based on the new information acquired by them that both the public school and Saint Joseph's could provide the desired "supplemental programming" for the twins. Thereafter, DeViney, the Administrative Director of the Center wrote to plaintiff explaining the reasons for the change in the public school recommendation, stating:
No change with the first sentence that the boys not be retained in third grade and that they receive an individual remedial program. The changes suggested were that enrollment should be considered in a facility that will provide supplemental programming. The decision of preference was eliminated by the team based on additional information that either facility could provide such programming. The decision as to which school the youngsters would attend was left to the discretion of Judge Shelton. [Emphasis supplied].
*425 Plaintiff withdrew his complaint and the order to show cause seeking the transfer of the children from Saint Joseph's to the public school was discharged.
In September, 1980, plaintiff wrote to Sister Ripp asking her to advise him of what supplemental programming the twins were going to receive while at Saint Joseph's. Plaintiff spoke with Sister Ripp and was informed that the twins would not receive any supplemental programs because "recent testing by the staff at Saint Joseph's had indicated that both were functioning in their respective grade levels, Jimmy in the third grade, Johnny in the fourth" and "[t]he teachers felt that [the] supplemental program[s] offered by the public schools were not necessary...." In December, 1980, because he deemed Sister Ripp's response unsatisfactory, plaintiff filed an application in his divorce action in the Chancery Division for the appointment of a guardian for his children. He hoped that a guardian would correct what he viewed as improper treatment of his children, to wit, "Jimmy [had] failed and neither twin was getting remedial help of any kind." The application was subsequently dismissed as part of an overall settlement of the divorce proceedings involving plaintiff and Mrs. Henderson. Plaintiff's divorce was finalized in January, 1981. The children completed the 1980-1981 school year at Saint Joseph's and then moved to Pennsylvania with their mother.
Plaintiff claims that as a result of conduct of the Hospital and Saint Joseph's and their respective employees he suffered severe mental trauma, lost time from work and incurred considerable expenses. Among the expenses claimed are $1500 for legal fees in attempting to have the Center's child study team recommendations followed and $700 of a $1,082.74 Center bill for the Center's evaluation and report. The essential thrust of plaintiff's charges against the Hospital and its staff are that the Center's child study team had no valid basis to alter its opinion and change its recommendations and that the Center should have known that supplemental remedial programs could be secured in either a parochial or public school setting. He *426 further charged that the Hospital's Center violated standards established by State law for child study teams. Plaintiff charged that Saint Joseph's violated State laws and regulations by refusing to follow the Center's child study team recommendations. Specifically, he claimed that a conference should have been held with the child study team, parents and teachers to review the recommendations and set up a supplemental program for his children.
Judge D'Ambrosio in the Law Division dismissed plaintiff's claim for negligent infliction of emotional harm after plaintiff's opening to the jury and granted defendants' motions for judgments of involuntary dismissal at the conclusion of plaintiff's proofs. The trial judge dismissed the claim against the Hospital and its employees for negligent infliction of emotional distress because this claim did not fit within the parameters set for such claims by our Supreme Court and dismissed the claim based upon negligent preparation of the report for the reason that plaintiff failed to prove a proximate causal relationship between the alleged wrongful conduct of the Hospital and its employees and the damages he sustained. The trial court dismissed the claim against Saint Joseph's and its employees because plaintiff failed to prove that they committed any wrongful act. This appeal followed.

I.
Preliminarily we are constrained to point out that the judgments entered in favor of defendants from which this appeal was taken were not final judgments. They were not final as to all issues and all parties because there still remains for determination by the trial court the issues raised by the Hospital's counterclaim against plaintiff. See Hudson v. Hudson, 36 N.J. 549, 552-553 (1962); Florio v. Galanakis, 107 N.J. Super. 1, 5 (App.Div. 1969). Clearly, the judgments under review were interlocutory and not appealable as a matter of right. See R. 2:2-3(a)(1). Application should have been made *427 to this court for leave to appeal from these judgments. R. 2:5-6(a); R. 2:2-3(b); R. 2:2-4; Delbridge v. Jann Holding Company, 164 N.J. Super. 506, 509 (App.Div. 1978). Moreover, because the appeal was improvidently filed, respondents, particularly the Hospital, had a responsibility to the appellate court to file a timely motion to dismiss the appeal. Delbridge v. Jann Holding Company, supra; Brown v. Brown, 147 N.J. Super. 156, 157 (App.Div. 1977). However, at this late stage and in the interest of the prompt disposition of the matter, we hereby grant the necessary leave to appeal nunc pro tunc. See Yuhas v. Mudge, 129 N.J. Super. 207, 209 (App.Div. 1974). See also Ibberson v. Clark, 182 N.J. Super. 300, 302-303 (App.Div. 1982). We turn therefore to a consideration of the merits of the appeal.

II.
Plaintiff first contends that the trial court erred in granting judgment of involuntary dismissal in favor of the Hospital and its employees because he had "made a prima facie case that he was owed a duty, that the duty was breached and as a result of the breach of duty, he suffered damages." Unfortunately, plaintiff devotes his entire discussion to the Hospital's duty and the breach thereof rather than to the reason the trial court granted the motion. The motion was granted not because the Hospital and its employees did not owe plaintiff a duty or because they did not breach that duty. On the contrary, the trial court accepted as true that the Hospital was negligent and guilty of malpractice in failing to know that the recommended remedial programs could have been provided in the private parochial school and therefore they should not have recommended that plaintiff's children be transferred out of Saint Joseph's to a public school system. Rather, the trial court granted the motion because it found that plaintiff had failed to show a proximate causal relationship between the Hospital's negligence and malpractice and the damages he sustained.
*428 The test to be followed in a ruling on a motion for a judgment of involuntary dismissal under R. 4:37-2(b) is clearly set forth by our Supreme Court in Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969). If, accepting as true, all the evidence which supports the position of the party defending against the motion and according him the benefit of all reasonable and legitimate inferences which can be deduced therefrom, reasonable minds could differ, the motion must be denied. Simply stated, if reasonable men could honestly differ as to the conclusions to be drawn from the facts of the case, the matter should be submitted to the jury. See Stec v. Richardson, 75 N.J. 304, 309 (1979); Taylor v. Shepard, 136 N.J. Super. 85, 90 (App.Div. 1975), aff'd, 70 N.J. 93 (1976); Atlas v. Silvan, 128 N.J. Super. 247, 250 (App.Div. 1974). In light of the foregoing, we are satisfied that the trial court properly granted judgment of involuntary dismissal in favor of the Hospital and its employees. The trial court properly held that plaintiff failed to introduce evidence or reasonable inference therefrom showing a proximate causal relationship between the Hospital's negligence and the damages he allegedly sustained in attempting to enforce the recommendations of the child study team. A jury question as to the Hospital's liability was not presented simply by the introduction of evidence that the latter was negligent or guilty of malpractice in connection with the child study team report.
It is fundamental that for plaintiff to prevail in this action, in addition to showing that defendants were negligent or guilty of malpractice, he had to prove that their negligence and malpractice was a proximate cause of his damage and loss. Proximate cause has been defined as "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." Fernandez v. Baruch, et al., 96 N.J. Super. 125, 140 (App.Div. 1967), rev'd on other grounds, 52 N.J. 127 (1968). Stated differently, plaintiff must show that defendant's conduct constituted a cause in fact *429 of his damage and loss because an act or an omission is not regarded as a cause of an event if the event would have occurred without it. Kulas v. Public Service Elec. & Gas Co., 41 N.J. 311, 317 (1964). See also Prosser, Torts, § 41, page 236, 238 (1971). If the damage and loss were to occur in the absence of defendant's negligence and malpractice, then before responsibility may be imposed the negligent conduct must have been shown to have been a substantial factor in causing the harm. See State v. Jersey Central Power & Light Co., 69 N.J. 102, 110 (1976); Restatement, Torts 2d, § 432(1) at 430 (1965).
Here, the uncontroverted proofs show that the losses and damages claimed by plaintiff would have occurred in the absence of defendant's negligence and malpractice in rendering the child study team report. The alleged negligence and malpractice clearly were not a substantial factor in plaintiff's decision to compel a transfer of his children from Saint Joseph's to a public school. Plaintiff would have pursued the same course of action, incurring the same legal costs and expenses even if the Hospital had not been negligent and guilty of malpractice in connection with its report. The Hospital's negligence in failing to know that supplemental remedial programs were available not only in the public school system but also in the parochial school system had virtually nothing to do with plaintiff's pursuing the course of action that he followed. Plaintiff testified that he would have gone to court in any event because the report recommended against James' retention in the third grade. This is perfectly clear from the following colloquy between the trial court and plaintiff:
THE COURT: Okay. Now, the report comes out and it says what it says. I am not changing a word of it; I am not asking you to assume any changes in the report. All I am asking you to change is this assumption.
What if you had become aware at the time the report is issued that any remedial assistance in the public school in specific subjects could be obtained without transferring them from St. Joseph's to the public school? Would you still have had other reasons that would have caused you to go and seek the order to show cause to transfer them to the public school?
THE WITNESS: As long as their report said retention for Jimmy is not recommended, I would have pursued it legally.

*430 THE COURT: So that I take it your answer to the question is: Yes, you would have done it anyway, even if you had known that they could receive the remedial help, because there you had another overriding consideration. You felt St. Joseph's was going to retain James in the third grade; you felt that the public school wouldn't. And therefore, even if he could get the remedial help at St. Joseph's, I want him transferred to the public school?
THE WITNESS: That's correct.
Plaintiff did not want his twin boys to be separated by their grade level. Thus, when he learned that one of them was failing and would be retained in the third grade he embarked on a course of legal proceedings that he thought would achieve the result he desired. As he pointed out, even if he had known that the remedial help was available at Saint Joseph's he would still have filed the proceedings in the divorce case to obtain a transfer of his children from Saint Joseph's to the public school system to prevent the proposed grade split of these twins. This overriding factor coupled with the continued financial drain of private school tuition which plaintiff could apparently no longer afford was the reason plaintiff sought intervention regardless of any recommendation by the Hospital's child study team. Consequently, there was no causal relationship between the Hospital's error in not knowing that remedial help was available in both the public and private parochial school system and the damages sustained by plaintiff. In our view a reasonable jury could not have found to the contrary.

III.
We are also convinced that the trial court, following plaintiff's opening statement to the jury, properly dismissed plaintiff's claims against the Hospital and its employees based on a tort theory commonly known as "negligent infliction of emotional distress." This decision is consistent with Portee v. Jaffee, 84 N.J. 88 (1980). There, the Supreme Court held that recovery for the negligent infliction of emotional distress requires proof of: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured *431 person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." Id. at 101. The remedy afforded by Portee v. Jaffee is clearly designed to provide a recovery for plaintiff's emotional distress resulting from the death or serious physical injury to a close relative; not for an underlying injury to the plaintiff. Plaintiff's claim here is well beyond the outer limits fixed by our Supreme Court for awarding damages on a theory of negligent infliction of emotional distress. Plaintiff could not prove the death or serious physical injury to any member of his immediate family, an essential element of this tort. In our view, extensions of the right to recover to plaintiff in the circumstances of this case would be unreasonable. See Brehm v. Pine Acres Nursing Home, 190 N.J. Super. 103, 110 (App.Div. 1983).

IV.
We are thoroughly satisfied that the trial court also properly granted judgment of involuntary dismissal in favor of Saint Joseph's and its employees on the ground that plaintiff failed to prove the intentional infliction of emotional distress upon him. Their refusal to discuss plaintiff's children with him or follow the recommendations of the Center's child study team in the circumstances of this case cannot support an award of damages on the tort theory advanced by him. There was not a scintilla of evidence presented that would support a finding that Saint Joseph's and its employees willfully and maliciously damaged plaintiff or that their conduct in this matter was so extreme and outrageous that plaintiff should be entitled to damages for emotional distress under principles discussed in Restatement, Torts 2d, § 46. Moreover, neither Saint Joseph's nor its employees violated any State statute or regulation dealing with the education of handicapped children with regard to plaintiff or his children.
*432 N.J.S.A. 18A:46-1 et seq. and the regulations promulgated to implement such statutes, N.J.A.C. 6:28-1.1 et seq., then in effect, established a statutory and regulatory scheme for the education of handicapped children.[1] Under this scheme, the local board of education was charged with adopting procedures for annually locating pupils who may have been handicapped, N.J.A.C. 6:28-1.4, and for insuring that those pupils were referred to the "basic child study team" within 7 days after parental approval had been granted. N.J.A.C. 6:28-1.5. The identification procedures included participation of instructional, administrative and pupil personal services staff of the local school district. N.J.A.C. 6:28-1.4(c). The "basic child study team" was then required to conduct a "comprehensive evaluation" of the referred child, N.J.A.C. 6:28-1.6, and determine if classification was necessary pursuant to N.J.S.A. 18A:46-8 and N.J.A.C. 6:28-1.7. After classification, the basic child study team, the parents, teachers and, where appropriate, the pupil were required to draft an Individualized Education Program (IEP) for the pupil. N.J.A.C. 6:28-1.8. The IEP was required to be implemented within 30 days of the conference date. N.J.A.C. 6:28-1.8(j).
Pursuant to N.J.S.A. 18A:46A-1 et seq., students attending nonpublic schools are entitled to certain "auxiliary services." These auxiliary services include, inter alia, "compensatory education" and "supplementary instruction." N.J.S.A. 18A:46A-2(c). Supplementary instruction under the former regulations meant "instruction provided for a pupil classified pursuant to N.J.S.A. 18A:46-8 as handicapped." N.J.A.C. 6:28-5.2(3). In light of the statutory and regulatory scheme outlined above it is perfectly clear that Saint Joseph's and its employees did not violate any law with regard to the supplemental instruction *433 issue. Here, none of plaintiff's children were classified as "handicapped." In fact, we are not even dealing with a "basic child study team" because its members were not local school board employees. See N.J.A.C. 6:28-1.3(a). Saint Joseph's obviously was aware of the fact that it was dealing with a private counseling service and certainly not legally bound to follow its recommendations.
Compensatory education under the former regulations involved remedial programs designed to improve the level of a pupil's proficiency in the areas of reading, writing and mathematic skills and preventive programs designed to prevent a pupil's regression in these same areas. N.J.A.C. 6:28-5.2 1. and 2.; N.J.A.C. 6:8-1.1. "The basis for determining the eligibility of a nonpublic school pupil for" these compensatory education services was the same as the criteria used for "public school pupils for the same service...." N.J.A.C. 6:18-5.4(a). Under these criteria, Saint Joseph's was charged with determining the children's needs and eligibility for these services. Specifically N.J.A.C. 6:8-3.4 provided:
(a) Pupil needs shall be assessed by teaching staff members to determine pupil attainment of educational objectives. Procedures for each assessment shall include but not be limited to teacher observation, parental or guardian interview, formal and informal evaluation techniques, cumulative pupil records, student performance data collected through local testing programs which meet State criteria, State testing results and visual, auditory, and/or medical examination. Pupil identification required by N.J.A.C. 6:8-3.8 (Pupil minimum proficiency levels and preventive and remedial programs in communication and computational skills) shall be determined as part of this assessment of pupil needs.
Contrary to plaintiff's claim, neither Saint Joseph's nor its employees violated this regulation. As appears from the record, plaintiff's children were evaluated each year. For the 1979-1980 school year, on the basis of the evaluation, Mrs. Henderson requested and the children received compensatory education. In the following year, the evaluation was done, and as Saint Joseph's principal informed plaintiff, the school teaching staff determined that remedial education was no longer necessary.
*434 Further, we do not construe this regulation that "[p]rocedures for such assessment shall include ... parental or guardian interview ..." to require interviews of both parents in every situation. Here, it is undisputed that Saint Joseph's interviewed Mrs. Henderson, who was the custodial parent of the children and complied with her wishes concerning the education of these children. In these circumstances there was no reason for Saint Joseph's to interview plaintiff  the non-custodial parent  and its failure to do so did not give rise to a cause of action for the intentional infliction of emotional distress.
Although the Center originally recommended that a public school should be considered for plaintiff's children because of the supplemental programs available in that setting, it appears that the Center subsequently learned that such programs were also available in the private parochial school, and changed its recommendation, leaving to the discretion of Judge Shelton the decision as to which school the youngsters would attend. Thus, Saint Joseph's had no reason or authority to transfer plaintiff's children to a public school. It is fundamental that no school has the authority without the custodial parent's consent or court order to transfer a child within its care to another school. Plaintiff's wife had custody of all three children and she did not agree to transfer them to the public school. Consequently, Saint Joseph's and its employees could not possibly be guilty of extreme and outrageous conduct in refusing plaintiff's demand to have his children transferred to the public school system.

V.
Finally, all of the other contentions raised by plaintiff are clearly without merit and warrant no further discussion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] All cites to the New Jersey Administrative Code refer to the regulations effective in 1979-1981. The regulations dealing with the education of handicapped children and auxiliary programs for nonpublic school children were subsequently revised with the revisions becoming effective on July 16, 1984.