292 N.J. Super. 293 (1996)
678 A.2d 1115
DAVID METTINGER, PLAINTIFF-RESPONDENT-CROSS-APPELLANT,
v.
W.W. LOWENSTEN, INC., DEFENDANT-THIRD-PARTY PLAINTIFF-APPELLANT-CROSS-RESPONDENT, AND GLOBE SLICING MACHINE CO., INC., NEW GLOBE PARENT, INC., DAPHNE HORIZON CO., INC., MOZLEY MANUFACTURING CO., INC., ABC 1-5 (SAID ENTITIES BEING FICTITIOUS AND UNKNOWN) AND XYZ 1-5 (SAID ENTITIES BEING FICTITIOUS AND UNKNOWN COMPONENT PARTS MANUFACTURERS), DEFENDANTS, AND GLOBE FOOD EQUIPMENT CO., THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 3, 1996.
Decided July 16, 1996.
*299 Before Judges LONG, BROCHIN and LOFTUS.
Michelle Leyva argued the cause for appellant-cross-respondent W.W. Lowensten, Inc. (Melli & Wright, attorneys; Ms. Leyva, on the brief).
Cynthia A. Walters argued the cause for respondent-cross-appellant David Mettinger (Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, attorneys; Ms. Walters and Stewart M. Leviss, on the brief).
Betsy G. Liebman argued the cause for respondent Globe Food Equipment Co. (Capehart & Scatchard, attorneys; Ms. Liebman, on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
This is a products liability case. On November 22, 1988, while plaintiff David Mettinger was working at a Quick-Check convenience *300 store, the rapidly rotating blade of a Globe model 500 slicing machine used to slice cheeses and meats severely lacerated his right hand. He sued defendants Globe Slicing Machine Co., Inc., the manufacturer of the slicer, and W.W. Lowensten, Inc., its distributor, to recover damages for his injury.[1] No answer was filed on behalf of Globe Slicing Machine Co., Inc., which is apparently no longer in existence. Lowensten filed a third-party complaint against Globe Food Equipment Company, which it alleged had acquired the original manufacturer's assets and had continued its product line. Lowensten claimed indemnification from Globe Food Equipment Company, contending that that company was subject to the original manufacturer's primary responsibility for any design defect. Before trial, an order for summary judgment was entered in favor of Globe Food on the ground that, as a matter of law, it was not subject to successor liability. A jury returned a verdict for $350,000 against Lowensten and in favor of plaintiff.
In the first part of this opinion, we will deal with Lowensten's challenge to the verdict in favor of plaintiff. In the second part, we will explain our decision regarding Lowensten's challenge to the order for summary judgment in favor of Globe Food.

1
Plaintiff was employed as the assistant manager of a Quick-Check convenience store. On the day he was injured, he was *301 working at another Quick-Check store, substituting at the request of the store manager for an absent clerk who had notified the manager that she would be late. At approximately 7:00 p.m., plaintiff started to clean up before leaving. Jerry Kappmeier, the assistant manager regularly assigned to the store, was making a tuna fish sandwich for a customer. The delicatessen slicing machine was standing on a counter, unattended. Its blade guard had been removed, and the machine was running. Whether the machine was in that condition because the blade was being cleaned by plaintiff or sharpened by Kappmeier was disputed.
While plaintiff was walking from one spot to another to empty a trash can, his foot slipped and he lost his balance. He is right-handed. Instinctively, he reached out with his right arm to grab something to steady himself. His right hand came into contact with the rapidly rotating, unguarded blade of the slicing machine. The blade sliced diagonally through the skin, muscles, tendons, blood vessels and nerves of the ring, index, and middle fingers of his right hand, cutting to the bone.
Plaintiff looked at his hand and saw "that it was in half." Blood was flowing freely from the hand. Plaintiff was finally able to stop the bleeding by pressing his hand between his legs. An ambulance took him to the emergency room of the Passaic General Hospital where his wound was stitched temporarily. The next morning, he underwent surgery to his hand. He was in the hospital four days. The large bandage that covered his entire hand was removed after approximately two and a half months. Plaintiff testified that his hand was very painful during that time, and he continued to take prescription medicines for the pain for almost five months.
When all of the bandages were finally removed, the palm and three middle fingers of plaintiff's hand were scarred and numb. The loss of sensation has continued with only slight improvement. Dr. James B. Massengill, an orthopedist who specializes in hand surgery, described plaintiff's loss of sensation as "extreme." As the result of the operation which partially repaired the severed *302 tendons, plaintiff regained the capacity to bend his injured fingers somewhat, but he cannot bend them sufficiently to open or close his hand. According to Dr. Massengill, plaintiff has lost more than three-quarters of the normal range of motion of his middle finger at its middle joint; slightly more than one-half of the range of motion of his ring and index fingers at their middle joints; and, although his little finger was not cut by the slicer blade, it has lost half of the normal range of motion at its upper joint because of its interaction with the injured tendons. Plaintiff testified that he can grasp objects securely only with his thumb and little finger.
According to Dr. Massengill, the severed nerves were not successfully repaired. The two main arteries which bring blood to the tips of the fingers remain severed. Blood reaches the injured fingers through smaller blood vessels, but the blood supply is inadequate, leaving the fingers sensitive to cold and painful as a result, even at room temperatures as high as 65 or 70 degrees. Dr. Massengill testified that plaintiff's loss of sensation and his sensitivity to cold would be permanent. He expressed the opinion that a further surgical operation would, if successful, give plaintiff's fingers some additional range of motion, but their function would still not be normal and the operation would have some risks.
Plaintiff was thirty years old when he injured his right hand. He had served in the Marine Corps for eighteen months and had received his high school diploma while he was in the Marines. After his discharge, he worked as a sheet rock installer in the construction industry for more than seven years and attained a high level of skill in that occupation. When jobs became scarce in the construction industry, he went to work for Quick-Check. He had been working for Quick-Check first as a clerk and then as an assistant manager for approximately a year and four months when he was injured.
About five and one-half months after the accident, plaintiff returned to work at a Quick-Check store. During his first hour on the job, his right hand became wedged in between a wall and the faucet of a sink. Because of the loss of sensation in his hand, *303 he was unaware of his predicament. He turned to walk away and again injured his hand. He had to return to the doctor who was treating his hand and to stay out of work for an additional period.
Plaintiff again returned to work at a Quick-Check store approximately seven months after the accident. However, he continued to have difficulties performing his job. For example, he had to lift boxes off trucks and from the coolers and freezers. The boxes would often slip out of his hands. If his hand was exposed to a cold temperature for just a short time, it would be painful. He also had trouble writing. Eventually, he was fired.
Plaintiff worked at seven different jobs after Quick-Check. He tried working as a drywall applicator, but he lasted only half of a day. His hand became swollen and hurt too much to continue swinging a hammer and the hammer would fall out of his hand. He tried working as a banquet waiter, but he was too slow and after a time he was told that he would not be needed. He worked at a car wash, but it was winter and he would take warm towels from the dryer and wrap them around his hand. His boss saw him do that too many times and dismissed him. For five months prior to the trial, he worked as a forklift operator, moving thousand-pound pallets to a warehouse. Operation of the forklift required plaintiff to manipulate three levers with his right hand. At the end of every day, his hand would swell and hurt, and he would have to soak it in hot water and take aspirins for the pain.
Before plaintiff's injury, he played an acoustical guitar, piano and keyboard organ. At one time, he played these instruments professionally. After the accident, he could play the guitar only by holding the pick between his thumb and small finger, and it would fly out of his hand while he was playing. He could not play the piano or organ at all. He also had to give up most sports.
Edmond Provder, a rehabilitation counselor who appeared as an expert witness for plaintiff, testified that he had interviewed plaintiff at length, reviewed his records, and extensively tested his vocational capabilities. On the basis of the data which he gathered, Mr. Provder concluded that plaintiff no longer had the *304 capacity to work either as a drywall installer or as an assistant manager of a convenience store because he had lost the ability to grasp and manipulate tools or lift weights of more than twenty pounds with his right hand. He would not be able to safely and efficiently operate, disassemble and clean a slicing machine like the one he used at Quick-Check because of his loss of finger dexterity, coordination, and sense of touch in his right hand. According to Mr. Provder, all of the jobs which plaintiff had tried since his accident exceeded his capabilities, which limit him to performing sedentary work with light physical demands. As examples of jobs which plaintiff is capable of performing, Dr. Provder mentioned "water filler," "security guard" and "messenger." On the basis of average earnings reported by the New Jersey Department of Labor, Mr. Provder expressed the opinion that a drywall installer would have an earning capacity of $25,272 a year, approximately $10,000 a year more than plaintiff could earn in any of the jobs to which he is now limited. There was no testimony which expressly forecast the probable duration of plaintiff's working life, but he was 35 or 36 years of age when the case was tried. The trial court charged the jury that he had a life expectancy of 46 more years from the date of the accident. From this information, the jury could reasonably have inferred that in the normal course of events he would work for another 25 or 30 years.
The liability theory on which plaintiff's case was presented to the jury was that the Globe model 500 slicing machine which cut his hand was flawed by two defects, each of which was a proximate cause of his injury. Both of these defects related to the danger of injury to the operator if the guard which normally shielded the upper edge of its razor-sharp, circular blade was removed while the blade was rotating. One defect, plaintiff alleged, was that when Lowensten sold the slicing machine to Quick-Check in 1980, it did not provide labels, manuals or placards to adequately warn a user of the danger, and adequate warnings were not supplied during the period between the sale and plaintiff's injury. The other defect was that when the slicing machine was sold to Quick-Check, *305 it was not reasonably fit, suitable, or safe for the purposes for which it would foreseeably be used because it lacked an interlock which would prevent operation of the machine when the guard was removed from the blade. Plaintiff contended that if the slicer had been equipped with a blade guard interlock, either the guard would have been in place and he would not have been injured at all or else the blade would not have been moving and, as his expert witness persuasively testified, either he would have escaped injury entirely or he would have suffered only a comparatively minor cut.
The case was submitted to the jury on special interrogatories. The jury found that the Globe model 500 slicing machine had been "defectively designed in that it was not reasonably fit, suitable, or safe for its foreseeable purposes"; that "it failed to contain an adequate warning which sufficiently alerted those who would use it for its foreseeable purposes [to] any danger or risk of harm"; but that the absence of an adequate warning was not "a proximate cause of the plaintiff's injuries." As we previously mentioned, the jury returned a verdict of $350,000 in plaintiff's favor.
Lowensten challenges that verdict on appeal by arguing that the amount of damages was so excessive that it was against the weight of the evidence and that both the assessment of damages and the determination of liability constitute a miscarriage of justice. Under these general argument points, Lowensten advances a laundry list of approximately two dozen specific challenges to the trial court's procedural and evidentiary rulings and to the sufficiency of the evidence. Our opinion will deal expressly only with challenges that are not entirely insubstantial. Furthermore, in view of the jury's proximate cause finding, we will not concern ourselves with arguments which deal only with defective warnings.
Because the cutting blade of a slicing machine of the type on which plaintiff was injured comes into direct contact with food, it requires frequent, thorough cleaning. The evidence at trial showed without dispute that when the slicer was sold in 1980 and thereafter, it was objectively foreseeable that from time to time *306 persons operating the machine would attempt to clean the slicer blade by removing the guard and, with a stick or by hand, holding a rag or sponge against the blade while it was spinning at a very rapid speed. In fact, the printed manual which Lowensten distributed with the machine when it was sold recommended cleaning the blade while it was rotating. It was also conceded that using that method of cleaning the blade was potentially dangerous. An interlock that stopped the motor when the guard was removed would have avoided that hazard and the related danger that the blade would be left spinning and exposed while unattended.
On the basis of the trial evidence, it was indisputable that in 1980, when the slicer in question was produced, it could readily have been manufactured with an interlock. Interlock technology had been used for many years in many industries, including the food industry, although in 1980 no food slicer incorporated an interlock that would be triggered by the removal of the blade guard. In 1984, however, the manufacturer of the Globe model 500 slicer discontinued its production and introduced a new model, model 500L, which was substantially identical to the model 500 in appearance and operation except that the newer version was built with a blade guard interlock. There was no change in the relevant technology between 1980 and 1984. There was no suggestion that the incorporation of a blade guard interlock impaired the functionality of the slicer. There was some dispute about the cost and feasibility of retrofitting model 500 slicers with blade guard interlocks, but both parties' experts agreed that modifying the design to incorporate them during manufacture would not have required either a substantial design effort or a significant additional cost. Shortly after the Globe model 500L slicer was introduced, a blade guard interlock was also incorporated into a similar food slicer which was being built in Italy for Lowensten and which Lowensten sold in the United States as its own product.
The jury found from these facts that the Globe model 500 food slicer which caused plaintiff's injury was flawed by a defective design when Lowensten sold it to Quick-Check in 1980. Lowensten's *307 most substantial challenge to the liability verdict is its contention that the trial court erroneously instructed the jury to determine whether the slicing machine was defectively designed on the basis of a "consumer expectations" test rather than a "riskutility analysis."
The portion of the jury charge to which Lowensten points is the following:
A design defect may be established by proof that the product did not safely perform the job for which it was built, contrary to the user's reasonable expectations. For example, a bicycle would be defective if it were designed so that its brakes did not hold in situations where a rider would reasonably expect the brakes to hold. In other words, you should ask yourselves, what was the intended function or functions of the product, and has the plaintiff shown that the product did not fulfill safely the intended function or functions? If plaintiff has demonstrated that the product did not fulfill its intended function safely, you should consider the product defective.
[Emphasis added].
"Consumer expectations" as a test for determining whether a product was defectively designed first appeared in New Jersey law in Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 406 A.2d 140 (1979). The opinion declares:
In some improper design situations the nature of the proofs will be the same as in other unintended defects cases [i.e., cases of defects caused by faulty handling or manufacturing]. This occurs when it is self-evident that the product is not reasonably suitable and safe and fails to perform, contrary to the user's reasonable expectation that it would "safely do the jobs for which it was built." Greenman v. Yuba Power Products, Inc., [59 Cal.2d 57, 64, 27 Cal. Rptr. 697, 701, 377 P.2d 897, 901 (1963)]. Thus, if one purchased a bicycle whose brakes did not hold because of an improper design, the manufacturer's responsibility would be clear without more. The product would not satisfy the reasonable expectations of the purchaser.

[Id. at 170-71, 406 A.2d 140 (emphasis added)].
The "consumer expectations" test as a criterion of the defectiveness of a product next appeared in O'Brien v. Muskin Corp., 94 N.J. 169, 463 A.2d 298 (1983), a case in which the design defect alleged was the use of a vinyl liner in an above-ground swimming pool. The Court wrote:
Risk-utility analysis is appropriate when the product may function satisfactorily under one set of circumstances, yet because of its design present undue risk of injury to the user in another situation.

*308 Another standard is the consumer expectations test, which recognizes that the failure of the product to perform safely may be viewed as a violation of the reasonable expectations of the consumer. Suter, 81 N.J. at 170-71, 406 A.2d 140. In this case, however, the pool fulfilled its function as a place to swim. The alleged defect manifested itself when the pool was used for diving.
[Id. at 181-82, 463 A.2d 298 (emphasis added)].
The O'Brien Court implicitly ruled that the "consumer expectations" test was inapplicable to the case before it, and proceeded to discuss how the risk-utility test should be applied. A concurring opinion by Justice Clifford criticized the majority for having "breathe[d] life into the cadaver of the `consumer expectations' test for a design defect" because using that criterion "as a gauge for determining defect ... is contrary to a fundamental basis of strict liability because the consumer simply does not have adequate information to know what to expect." Id. at 188, 463 A.2d 298 (J., Clifford, concurring) (citation omitted).
Only one reported appellate case besides Suter and O'Brien refers to "consumer expectations" as a test to prove that a product is defectively designed.[2]See Ladner v. Mercedes-Benz of N. America, Inc., 266 N.J. Super. 481, 630 A.2d 308 (App.Div. 1993), certif. denied, 135 N.J. 302, 639 A.2d 301 (1994). There the plaintiff alleged that an automobile was defectively designed because putting the transmission lever in the "park" position did not hold the car securely on an incline. We held that the trial "judge's decision not to instruct on the consumer expectation test" was not error because "[a]ll experts agreed that the car would not have rolled if it was in park, and there was no basis, short of speculation, to conclude that the gear shift had been placed in park...." Id. at 497, 630 A.2d 308. We therefore had no cause *309 to determine under what circumstances the "consumer expectations" test would be applicable to determine a claim of design defect.
Suter teaches that the "consumer expectations" test is applicable only where the product, "like a bicycle whose brakes [do] not hold because of an improper design," is "self-evident[ly] ... not reasonably suitable and safe and fails to perform, contrary to the user's reasonable expectation that it would `safely do the jobs for which it was built.'" Suter, supra, 81 N.J. at 170-71, 406 A.2d 140 (emphasis added) (quoting Greenman v. Yuba Power Products, Inc., supra). The design of a product is "self-evidently" defective when there are no relevant considerations which make the hazard inherent in the product or reasonably necessary to its functioning. With respect to such a product, the risk-utility balancing test is unnecessary. The only material question is whether the product has been designed so as to pose a hazard that is contrary to the user's reasonable expectations. In the present case, the evidence did not suggest any consideration of feasibility, cost or functionality which might tend to justify the omission of a blade guard interlock. The only relevant question left for the jury was whether the Globe Model 500 slicing machine was so hazardous that it was contrary to a user's reasonable expectations. Use of the "consumer expectations" test was therefore not error.
Similarly, O'Brien tells us that the "consumer expectation" test is applicable only where the product is unsafe in any foreseeable use. The facts of the present case meet these criteria, too, and lead us to the conclusion that the use of the "consumer expectations" test in the charge in this case was not error. A swimming pool can be used satisfactorily without diving, but a delicatessen slicing machine cannot be used satisfactorily without frequent and thorough cleaning of its blade.
Furthermore, plaintiff argues that even if charging the jury according to the "consumer expectations" test was error, the error was harmless because the trial court should have granted his *310 motion for a directed verdict on the issue of liability. Lowensten contends that a directed verdict was properly denied because issues of proximate cause presented an issue for the jury. We agree with plaintiff's argument insofar as he contends that the court could properly have decided as a matter of law that the Globe model 500 food slicer was defectively designed. Whether or not there were other fact issues which justified the trial court's denial of his motion for a directed verdict is immaterial to his argument that the court's "consumer expectations" instruction, if error, was therefore harmless.
Plaintiff's expert testified that the Globe model 500 food slicer was defective because cleaning it by holding a sponge or rag, either by hand or with a stick, against the rotating blade with the blade guard removed was an objectively foreseeable use; using it in that manner was dangerous because the user's hand could readily be pulled into the blade; the danger could have been obviated or greatly reduced by designing the slicer with an interlock which would cut off the electric current when the blade guard was removed; when the food slicer which injured plaintiff was manufactured and sold to Quick-Check in 1980, the technology for designing and building such an interlock was well known and was being utilized in the food industry, although it was not incorporated into a food slicer until 1984; the cost and design effort would have been minimal; and the utility of the product would not have been adversely affected. All of these facts were conceded by Lowensten's experts. In the face of these admitted facts, a reasonable jury could not rationally have reached any conclusion other than that, because of the omission of a blade interlock, the model 500 food slicer was defectively designed. See Jurado v. Western Gear Works, 131 N.J. 375, 619 A.2d 1312 (1993); Johansen v. Makita U.S.A., Inc., 128 N.J. 86, 96, 607 A.2d 637 (1992); Brown v. United States Stove Co., 98 N.J. 155, 170, 484 A.2d 1234 (1984); O'Brien v. Muskin, supra, 94 N.J. at 186, 463 A.2d 298.
*311 Lowensten argues that there was a jury question whether its food slicer was defectively designed because no other manufacturer had incorporated a blade guard interlock into the design of its machines until 1984, after the slicer at issue here had already been built and sold. However, if there is an available, effective and inexpensive safety device which would reduce or eliminate a danger otherwise posed by a product without adversely affecting the product's utility, the failure of all the manufacturers in an industry to introduce the device does not prevent their products from being defective and does not immunize any of them from liability. See O'Brien v. Muskin, supra 94 N.J. at 182-83, 463 A.2d 298; Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 397-98, 451 A.2d 179 (1982); Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 171-72, 406 A.2d 140 (1979). That everyone else's slicer was also defectively designed would be immaterial to the liability of the manufacturer of the Globe model 500 food slicer and it is therefore also immaterial to the liability of its distributor, Lowensten. See Promaulayko v. Johns Manville Sales Corp., 116 N.J. 505, 510-11, 562 A.2d 202 (1989). Since there was no dispute about any fact material to the proposition that the Globe model 500 food slicer was defectively designed, that issue could have been taken from the jury. See Johnson v. Salem Corp., 97 N.J. 78, 477 A.2d 1246 (1984). The court's "consumer expectations" charge, even if error, was therefore harmless.
Lowensten's remaining arguments directed at the jury instructions and verdict form are without substantial merit. The trial judge correctly instructed the jury in accordance with Stephenson v. R.A. Jones & Co., 103 N.J. 194, 200, 510 A.2d 1161 (1986), and Seeley v. Cincinnati Shaper Co., 256 N.J. Super. 1, 14-15, 606 A.2d 378 (App.Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992), that a manufacturer or distributor has "a continuing duty (but only within the original state-of-the-art) to correct a design defect which existed when the machine was placed into the stream of commerce by a manufacturer." Seeley v. Cincinnati Shaper Co., supra. The court's instruction on the state-of-the-art *312 defense, N.J.S.A. 2A:58C-3a(1), was not unfair to Lowensten. The court properly declined to give a comparative negligence charge because such a charge is not applicable to a workplace setting where the worker has no meaningful choice, Jurado v. Western Gear Works, supra, 131 N.J. at 387, 619 A.2d 1312, and "an instinctive reaction to unanticipated circumstances," like plaintiff's reaching out his arm to catch his balance, "is the type of general negligence which ordinarily cannot be admitted to prove comparative fault in a strict liability case." Ladner v. Mercedes-Benz, supra, 266 N.J. Super. at 496, 630 A.2d 308. The proximate cause issues, including the issues of misuse, which Lowensten raised at trial were non-existent or immaterial. See Jurado v. Western Gear Works, supra. Consequently, the court's charge that the slicer was being used for a foreseeable purpose and its refusal to charge on possible misuse were not error. The interrogatories submitted to the jury were consistent with the court's charge and were sufficiently clear and understandable to be utilized by the jury for the return of its verdict.
In accordance with law and the usual practice in civil cases, eight persons, six jurors and two alternates, were impanelled to try the case. N.J. Const., Art. 1, ¶ 9; N.J.S.A. 2B:23-1(b); R. 1:8-2(b). When the jury was about to retire for its deliberations, the court suggested that the two alternates be permitted to deliberate and vote with the six prescribed jurors. Plaintiff agreed, but Lowensten objected. Despite the objection, the court submitted the case for decision by a jury of eight persons. The jury answered some of the interrogatories submitted to it by a vote of seven to one and some by a vote of eight to nothing. Defendant now argues that by submitting the case to a jury of eight persons over its objection, the trial court committed reversible error.
The action of the trial judge was error. In view of the defendant's objection to departing from the number of jurors prescribed by the mandatory language of the Constitution, statute and court rule, there was no excuse for the judge's arbitrary ruling that he would permit eight jurors to deliberate and return *313 the verdict. Nonetheless, we are unwilling to reverse the case on this ground. Given that at least seven jurors voted in plaintiff's favor on every issue, the likelihood that the elimination of two jurors, whoever they might have been, would have changed the result is far too slight to require a retrial.
We also reject Lowensten's remaining arguments for reversal. The jury was the proper arbiter of plaintiff's credibility and of the significance to be attached to the contradictions in his testimony. There was ample evidence to support the damages award and the jury's verdict was not a miscarriage of justice. The trial court's rulings on the admissibility of various photographs and on the admissibility and scope of the testimony of plaintiff's witnesses, including its experts, were either within its discretion or, if error, harmless and incapable of producing an unjust result. Lowensten complains of two comments made by plaintiff's counsel during her summation; however, they were not objected to before the trial court and, in any event, in the context of the entire trial they were not prejudicial.

2
The food slicer which caused plaintiff's injury was designed by Mozley Manufacturing Co. The record does not disclose the date of the design. In 1980, Globe Slicing manufactured the slicer and sold it to Lowensten, and Lowensten sold it to Quick-Check that same year. In support of Globe Food's motion for summary judgment, its president submitted an affidavit in which he alleged upon information and belief that Globe Slicing "sold its outstanding stock together with all its assets and liabilities to New Globe Parent, which later became known as Daphne Horizon Company" and, "in late 1987, New Globe Parent sold Globe Slicing's meat slicing assets to Mozley Manufacturing Company, Inc...., an active Delaware corporation, which ... currently owns realty in Connecticut." The accident which is the subject of this law suit occurred November 22, 1988.
Plaintiff filed his initial complaint in this action on June 25, 1990. The only defendants were Lowensten, Globe Slicing, and several *314 fictitious entities, some of which were described as manufacturers and sellers of slicing machines and some as manufacturers and sellers of component parts. On July 26, 1990, plaintiff filed an amended complaint which added Mozley Manufacturing Co., Inc. as a defendant. Mozley was described as having "owned, controlled, purchased, acquired, merged with and/or otherwise succeeded to the interests of Globe [Slicing Machine Co., Inc.]" and as having manufactured and sold Globe Model 500 slicing machines. On August 7, 1990, plaintiff filed a second amended complaint which added New Globe Parent, Inc. and Daphne Horizon Co., Inc. as defendants. They, too, were described as having "owned, controlled, purchased, acquired, merged with and/or otherwise succeeded to the interests of Globe [Slicing Machine Co., Inc.]" and as manufacturing and selling Globe model 500 food slicers. Our record does not include the agreements which effected the transfers of stock or assets from Globe Slicing to the various entities through which they passed until they reached Mozley.
Globe Food Equipment Co., Inc. was incorporated in February 1991. On May 3, 1991, it acquired a portion of Mozley's meat slicing equipment assets in accordance with an asset purchase agreement and bill of sale.
Pursuant to an order entered December 7, 1992, Lowensten filed a third-party complaint for indemnification against Globe Food. The third-party complaint alleged that Globe Food was "a successor to the defendants who manufactured the slicer in question, namely, Globe Slicing Machine Co., Inc., New Globe Parent, Inc., Daphne Horizon Co., Inc. and Mozley Manufacturing Co., Inc...." Plaintiff did not file a claim against Globe Food.
Globe Food denied liability to Lowensten and moved for summary judgment dismissing the third-party claim. Globe Food claimed that it was not a successor to Globe Slicing's food slicer business and that the product-line successor liability doctrine established by Ramirez v. Amsted Industries, 86 N.J. 332, 431 A.2d 811 (1981), was applicable only in favor of an injured user of the product, not of a distributor seeking indemnification from the *315 manufacturer. Globe Food also contended that it could not be found liable to indemnify Lowensten because it had not been in existence when the machine which injured plaintiff was manufactured or sold, or when plaintiff's injury occurred, or even when plaintiff commenced his personal injury action, and the lapse of the two-year period of limitations for personal injury claims barred plaintiff from asserting a claim.
Summary judgment was granted in favor of Globe Food, dismissing Lowensten's third-party complaint. The motion judge ruled that there was a fact question whether Globe Food had acquired enough of the assets and business of Globe Slicing to be subject to successor liability at the suit of an injured user of a defectively designed product. But she held that however that issue might be decided at trial, Globe Food would not be liable to indemnify Lowensten, a distributor, because Lowensten had filed its third-party complaint after plaintiff's commencement of his personal injury action and after the two-year period of limitations for his suing the manufacturer had already elapsed. For the following reasons, we disagree with this ruling and therefore reverse.
Under New Jersey law, a user injured because of the defective design of a product can collect damages for his injuries from both the manufacturer and the distributor of the product, even if the distributor is entirely innocent of any culpability for the defect. See Promaulayko v. Johns Manville Sales Corp., 116 N.J. 505, 510-11, 562 A.2d 202 (1989); Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 394, 451 A.2d 179 (1982). In the absence of an agreement between them which expressly allocates the burden of tort damages, a party that is primarily liable is obligated to indemnify a party that is only constructively or vicariously liable. Promaulayko, supra, 116 N.J. at 511, 562 A.2d 202. "Consistent with this principle, actions by retailers against manufacturers have been recognized in this State for twenty years." Ibid. (citing Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 565, 410 A.2d 674 (1980); Newmark v. Gimbel's, Inc., *316 54 N.J. 585, 600-01, 258 A.2d 697 (1969)). In the present case, therefore, the same facts which support a jury verdict against Lowensten would also have supported a verdict against Globe Slicing.
Ramirez v. Amsted Industries, 86 N.J. 332, 431 A.2d 811 (1981), and Nieves v. Bruno Sherman Corp., 86 N.J. 361, 431 A.2d 826 (1981), hold
that where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor. The social policies underlying strict products liability in New Jersey are best served by extending strict liability to a successor corporation that acquires the business assets and continues to manufacture essentially the same line of products as its predecessor, particularly where the successor corporation benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers.
[Ramirez, supra, 86 N.J. at 358, 431 A.2d 811].
In Bussell v. DeWalt Products Corp., 259 N.J. Super. 499, 614 A.2d 622 (App.Div. 1992), certif. denied, 133 N.J. 431, 627 A.2d 1137 (1993), the defendant corporation had acquired only part of its predecessor's assets, those pertaining to the product whose defective design had caused the plaintiff's injury. By the time of the injury, the defendant had sold the product line and the assets pertaining to it to another financially responsible corporation which was also subject to successor liability. We nonetheless held the defendant liable to the injured party under the Ramirez rationale. Ramirez, Nieves, and Bussell demonstrate that if the plaintiff in the present case had pursued a timely crossclaim against Globe Food, he would have had the right to a trial of its liability as a successor to Globe Slicing.
The happenstance that Globe Food was not formed and did not acquire the assets which originally belonged to Globe Slicing until more than two years after plaintiff was injured would not have immunized Globe Food from successor liability to plaintiff. *317 The essence of successor liability is that the successor stands in the shoes of the potentially liable predecessor. A plaintiff who has commenced an action against a defendant or a deceased defendant's personal representative within the period of limitations is not barred from substituting a successor personal representative after the period of limitations has lapsed. R. 4:34-1(b); Stroman v. Brown, 194 N.J. Super. 307, 476 A.2d 874 (App.Div. 1984). A plaintiff who has commenced an action against a corporation within the period of limitations is not barred from amending his complaint to name the corporation which is its successor by merger, even if the successor corporation is formed and the merger occurs after the expiration of the pertinent period of limitations. N.J.S.A. 14A:10-6(e). Whether the plaintiff in the present case could have succeeded on a counterclaim against Globe Foods depends solely on whether Globe Food's acquisition of the assets which originated with Globe Slicing and its continuation of Globe Slicing's business demonstrate successorship within the Ramirez, Nieves, Bussell doctrine. If those facts establish successor liability, the timing of Globe Foods' organization does not confer immunity.
Since both Lowensten, the distributor of the slicing machine which injured plaintiff, and Globe Foods if it is the successor to Globe Slicing, the manufacturer, were potentially liable to plaintiffs, plaintiff's choice of defendants should not determine whether the burden of paying his damages should ultimately rest on Lowensten or on Globe Foods. Promaulayko and the cases cited therein require us to hold that if Globe Slicing would have been liable to indemnify Lowensten and if Globe Foods would have been liable to plaintiff as the successor to Globe Slicing, Globe Foods is obligated to indemnify Lowensten.
If the facts which are relevant to Lowensten's claim to indemnification from Globe Foods are genuinely disputed, those facts must be determined at a plenary trial. However, we hold that if Globe Foods is found liable to indemnify Lowensten against plaintiff's claim, Globe Foods is bound by plaintiff's judgment *318 against Lowensten and may not contest either the validity or amount of that judgment. This result is required by N.J.R.E. 803(c)(26). Insofar as pertinent, that rule states:
[T]he record of a final judgment is admissible if offered by the judgment debtor in an action in which he seeks to recover partial or total indemnity or exoneration for money paid or a liability incurred because of the judgment, as evidence of the liability of the judgment debtor, of the facts on which the judgment is based, and of the reasonableness of the damages recovered. If the defendant in the second action had notice of and opportunity to defend the first action, the judgment is conclusive evidence.
Cf. U.S. Wire & Cable Corp. v. Ascher Corp., 34 N.J. 121, 126-27, 167 A.2d 633 (1961); Scaglione v. St. Paul-Mercury Indem. Co., 28 N.J. 88, 104-05, 145 A.2d 297 (1958).
After Lowensten impleaded Globe Foods as a third-party defendant, Globe Foods obtained its dismissal from the action by moving for an order for summary judgment. We have held that the grant of that motion was error. An indemnitor could certainly not be liable for more than the obligation incurred by its indemnitee. Giving Globe Foods the opportunity to relitigate the validity of plaintiff's personal injury claim and the amount of his damages could therefore only benefit Globe Foods; if it is obligated to indemnify, the amount of its obligation could not be greater but might be less than the obligation to which its indemnitee is subject.[3] To permit Globe Foods to benefit by its having procured an erroneously granted summary judgment would be grossly unfair. Moreover, the personal injury action was fully and vigorously defended by Lowensten and there was no conflict of interest between it and Globe Foods on either the issue of liability or damages. See Restatement (Second) of Judgments § 57 (1982) (requiring that the indemnitee defend the action with due diligence and reasonable prudence and that there be no conflict of interest between the indemnitee and the indemnitor). Under these circumstances, we hold that Globe Foods had "notice of and *319 opportunity to defend the first action" within the meaning of N.J.R.E. 803(c)(26) and that, as between Lowensten and Globe Foods, the judgment against Lowensten is conclusive of the validity and amount of plaintiff's claim.[4]
There is one further procedural issue to be disposed of. Lowensten obtained defaults, but not default judgments, against Globe Slicing, New Globe Parent, Daphne, and Mozley because of their failure to provide discovery. Lowensten now asks us to enter default judgments against those defendants. However, R. 4:43-2 provides, "If the party against whom judgment by default is sought has appeared in the action, that party ... shall be served with notice of the motion for judgment filed and served in accordance with R. 1:6." Accordingly, Lowensten must make its motion for the entry of default judgments before the trial court on notice to the defaulting defendants. We express no view as to how the motion should be decided.
The judgment appealed from is affirmed insofar as it awards $434,274.88 in favor of plaintiff David Mettinger and against defendant W.W. Lowensten, Inc. The judgment is reversed insofar as it dismisses defendant W.W. Lowensten, Inc.'s crossclaim against Globe Foods Machine Co., Inc. The case is remanded to the Law Division for further proceedings not inconsistent with this opinion.
NOTES
[1] By amended complaints, plaintiff added Mozley Manufacturing Co., Inc., New Globe Parent, Inc., and Daphne Horizon Co., Inc. as defendants. These corporations are alleged to have been successors to Globe Slicing Machine Co. They filed answers, but defaults were entered against them for failure to answer interrogatories. No application was made for default judgments against them. See R. 4:43-2. The judgment against Lowensten is therefore interlocutory and this appeal is subject to dismissal because leave to appeal was not sought. See R. 2:2-3 (appeals to the Appellate Division from final judgments) and R. 2:2-4 (appeals to the Appellate Division from interlocutory orders). In the interest of justice, however, we grant leave to appeal nunc pro tunc. R. 2:4-4(b)(2); Henderson v. Morristown Memorial Hosp., 198 N.J. Super. 418, 426-27, 487 A.2d 742 (App.Div.), certif. denied, 101 N.J. 250, 501 A.2d 922 (1985).
[2] A different "consumer expectations" test has found a place in our products liability law as a defense to liability; e.g., if a reasonable consumer would expect a knife blade to be sharp, its sharpness, although posing a danger to the user, cannot be a defect. N.J.S.A. 2A:58C-3a(2); Roberts v. Rich Foods, Inc., 139 N.J. 365, 375-79, 654 A.2d 1365 (1995). However, the statute specifically states that this defense does not apply to "equipment used in the workplace" or to dangers that can "feasibly be eliminated without impairing the usefulness of the product."
[3] Because the issue has not been raised or briefed, we take no position on whether, if Lowensten is entitled to indemnification, its damages may include the expenses which it has incurred litigating against plaintiff.
[4] In a post-argument letter brief submitted at our request, Globe Foods argues that we should follow Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 531 A.2d 1078 (App.Div. 1987), certif. denied, 110 N.J. 196, 540 A.2d 189 (1988), which held that potential indemnitees that had been erroneously dismissed from a products liability suit before trial would be permitted to relitigate both the validity of the personal injury plaintiff's claim and the amount of their obligation to indemnify. We note that the Johnson opinion does not cite N.J.R.E. 803(c)(26). To the extent that Johnson differs from the result which we reach in this case, we respectfully disagree and decline to follow it. Cf. Ramos v. Browning Ferris Indus., 194 N.J. Super. 96, 102-03, 476 A.2d 304 (App.Div. 1984), rev'd on other grounds, 103 N.J. 177, 510 A.2d 1152 (1986); Hill v. Joseph T. Ryerson & Son, Inc., 165 W. Va. 22, 268 S.E.2d 296, 302 (1980).